## Craig & Blanchard *versus* Kline *et al.*
## Kline *et al.* *versus* Craig & Blanchard.

1. Amongst the powers of the states not surrendered to the General Government are the police powers exercised by passing laws to promote the peace, safety, good order, health and interests of a state.

2. A state may use the means to effectuate an acknowledged power in itself which Congress may apply for another purpose.

3. Congress may make that a regulation of commerce, which a state may employ as a guard for its internal policy or to preserve the public health or peace or to promote its peculiar interests.

4. When a state exercises her sovereign power in a matter involving the interests of her citizens, though it may touch upon a subject within the power to regulate commerce, it is not invalid unless it conflicts with a law of Congress on the same subject.

5. The Constitution of the United States confers no power of eminent domain or of legislation over state territory, except that relating to the seat of government and places purchased with the consent of the state for forts, &c.

6. Navigable streams within the states are subject to the regulating and police power of the state for the protection of the people and of internal commerce, when not in conflict with an Act of Congress to regulate commerce.

7. The Act of December 11th 1866, regulating the floating of logs, &c., on the Susquehanna, was a lawful exercise of the police power of the state and is constitutional.

8. A contract between Maryland and Pennsylvania to preserve the free and public navigation of the Susquehanna is not infringed by proper regulations to promote the navigation by making it safe and convenient to all and pre-venting it from being monopolized.

9. The Act of 1866 forbad the floating of saw-logs in the Susquehanna, below Northumberland, without being rafted or enclosed in boats and under the control of men actually on them; and provided that they might be taken up by any one when found "so floating," and unless redeemed in two months by payment of fifty cents for each log they should become the property of the captor. *Held*, that the owner's title to logs thus taken up could not be divested without notice, and an opportunity of showing that the logs had not been voluntarily set afloat loose.

10. "The law of the land" in the bill of rights means due process of law, not an act of the legislature.

11. All claims for justice are to be tried and enforced by the judicial authority of the state and by due course of law.

[Craig *v.* Kline.]

12. Under the Act of 1866, the mere fact of logs being found floating is not a ground of forfeiture; it is the voluntary act of floating which is prohibited.

13. The mere act of floating may justify seizure to *answer* the supposed offence.

14. Logs voluntarily floated and stranded may be taken up under the Act of 1866.

15. The Act of March 20th 1812, directing that the captor of logs shall lodge a list within thirty days with the nearest justice, which shall be published for three weeks, and if the owner shall not take the logs away within three months afterwards they shall be forfeited, is not repealed.

16. The Acts of March 20th 1812, April 20th 1853, May 8th 1855, April 10th 1862, and December 11th 1866, are *in pari materia.*

17. Replevin lies whenever one claims goods in the possession of another without regard to the manner in which they were obtained.

18. On the question of damages in replevin, the means by which the goods have been taken or retained will be considered.

19. Exemplary damages in replevin may be given when there has been outrage in taking or vexation or oppression in the detention.

20. If the taking or detention be under an innocent mistake, the measure of damages may be mere compensation.

21. Primâ facie, the value of the property when and where it is replevied, is the measure of compensation; but this may be varied by the character of the taking and removal to the place of replevy.

22. Herdic *v.* Young, 5 P. F. Smith, recognised.

March 10th 1870. Before Thompson, C. J., Read, Agnew and Sharswood, JJ.

Writs of error to the Court of Common Pleas of *Perry county:* No. 59, 61 and 62, of May Term 1870.

An action of replevin No. 18 to August Term 1869, was brought April 28th 1869, by John Craig and John Blanchard, trading as Craig & Blanchard, against Jacob L. Kline and others, for 2500 saw-logs marked on the end as specified in the writ, of the value of $8750, and 10,000 feet of boards, &c., of the value of $150, manufactured from logs of the plaintiffs with like marks. The plaintiffs pleaded " non cepit" and " property."

There was another action of replevin between the same parties, No. 88 to same term, brought July 6th 1869, for other lumber claimed by the plaintiffs. The pleas were the same, and both cases were tried together under the same evidence.

At the trial, January 6th 1870, before Graham, P. J., the parties agreed to the following facts:—

" That plaintiffs, in the spring of 1868, were the owners of the logs described in the return to the said writs of replevin; and that plaintiffs then being owners as aforesaid, voluntarily put saw-logs into the West Branch of the Susquehanna river, and voluntarily permitted the same to be floated into the main river Susquehanna, at Northumberland, and down the same, without the said logs being rafted and joined together, or enclosed in boats, and under the control, supervision and pilotage of men, specially placed in charge of same, and actually thereon: for the purpose of floating

[Craig *v.* Kline.]

them thus loosely to their mills, below the line of the state of Maryland; and that the defendants were in the possession of said logs at the time said writs were issued."

The plaintiffs then gave evidence of the value of the logs. It appeared also from the examination of their witnesses, that when the logs were first seen by their agent, they were on the islands of the defendants, on their cultivated fields, and that the defendants claimed to have taken them under the Act of December 11th 1866. The logs had been floated from Clearfield county, in April 1868—they were accompanied by a crew of eight horses and forty or fifty men, for the purpose of driving them down the river and keeping them floating contiguous to each other in the current of the stream; a great many logs were floated at this time, the river got too high and they could not be kept off the islands; logs could not be controlled when the river is high. The defendants said plaintiffs could have the logs on paying fifty cents each, which the agent declined and refused to pay anything to the captors but damages.

The defendants gave evidence, that in April 1868, a body of from 200,000 to 250,000 logs collected at "Divitt's" on the Susquehanna, came down the river, they captured about 370 in number, there was no one with them, nor were they rafted together; about 300 were on two islands of the defendants; the largest portion of the logs were taken whilst floating and the remainder were taken when lodged on the islands: the islands are in Perry county, below the town of Northumberland.

The defendants gave evidence, that rafts could not safely be navigated with a large amount of logs floating; that the rafts could not land nor get through shoots or narrow channels; an ordinary raft could not live in the drive of 1868; the witnesses testified to immense damage by the drive of logs in 1868 and described it; they stated also that if men had been on the logs they would have passed down without doing injury.

The defendants claimed to retain the logs under the following act, approved December 11th 1866, Pamph. L. 1867, p. 1366, Purd. 1468 :—

Sect. 1. That it is hereby declared to be the true intent and meaning of the 1st section of the act entitled, "An act to regulate the taking up of lumber in the rivers Susquehanna and Lehigh and their branches, approved the 20th day of March, A. D. 1812;" that any saw-logs may be taken up under the provision of said section, whether the same be put into the said streams intentionally or otherwise, and whether the same be floated intentionally or otherwise, the true intent and meaning thereof being that no saw-logs may be floated or driven therein, unless rafted and under the pilotage and control of men, and that all saw-logs not so rafted and under the pilotage and control of men shall

15 P. F. Smith—26

[*Craig v.* Kline.]

and may be taken up under the provisions thereof: Provided, that this section shall only apply to the Susquehanna river, between the town of Northumberland and the line of the state of Maryland; and the person or persons taking up any of said saw-logs so floating shall be entitled to receive from the owners thereof fifty cents for each log before delivering up the same.

Sect. 2. It shall not be lawful for any person or persons, company or companies, corporation or corporations, to float or direct and authorize to be floated down the Susquehanna river, between the town of Northumberland and the line of the state of Maryland, any saw-logs, without the same being rafted and joined together or enclosed in boats, and under the control, supervision and pilotage of men, especially placed in charge of the same and actually thereon. And any person or persons may take up the said saw-logs, or any of them, if they be found floating loose in said streams, and not under the personal charge of some one upon the same, and shall have the right to hold and possess the same against all persons whatsoever: Provided, that if the owner or owners of said logs or their agents shall appear and demand the same from the captor or captors, and shall and do pay therefor to the said captor or captors fifty cents for each and every saw-log so taken up within two months from the date of their being so taken up, it shall be the duty of the captor or captors to deliver over said logs to the owner or owners; but if no such owner or his or their agents shall appear within said time, and pay or offer to pay to the said captor or captors the said salvage-money, the said saw-logs shall be absolutely forfeited to and become the property of the said captor or captors. And provided further, that this act shall not apply to saw-logs now lying in the said stream, nor to any case in which by reason of high water, or from any other casualty, said saw-logs may be swept out of the West Branch and Susquehanna booms.

Sect. 3. All laws and parts of laws inconsistent with the provisions of this act shall be and the same are hereby repealed.

The Act of 20th of March 1812, 5 Smith 335, Purd. 613, pl. 9, &c., enacts: "If any logs, shingles, boards or lumber of any kind which may have been, or may be put into the river Susquehanna or either of its branches, or into the river Lehigh, and which may be taken up by any person or persons, floating down the waters of either said streams, it shall be the duty of the persons so taking up such lumber to lodge a list by him subscribed, within thirty days thereafter, with the nearest justice of the peace of the town or township where such lumber was taken up, of the number, quality and quantity of the logs, boards or other lumber, with the marks on the same." The act further provides that the justice shall enter the description of the lumber on his docket, and publish the same for three weeks, and if the

[Craig *v.* Kline.]

owner of such lumber or his agent shall not take the lumber away within three months after such publication, all such lumber shall become forfeit to the person taking up the same. The 2d section gives to the captor six cents per log if the owner of the logs take them away within three months after they are advertised. The 3d section imposes a penalty on persons taking up logs or lumber and not complying with the provisions of the act.

The following is the section of an act passed on the 20th of April 1855, Pamph. L. 646, Purd. 673, pl. 12: "It shall be lawful for any person owning or occupying an island in the Susquehanna river to advertise any lumber lodging on his or her land in the same manner, and under the same terms as is directed in the Act of the 20th of March 1812, entitled 'An Act to regulate the taking up of lumber in the rivers Susquehanna and Lehigh and their branches,' to which this is a supplement."

A supplement to the Act of March 20th 1812 was passed May 8th 1853, Pamph. L. 529, Purd. 673, 674, pl. 13, &c., viz. :—

Sect. 1. Any person or persons who shall take up any boards or lumber of any kind, logs, timber, shingles or shingle-bolts, found floating in the river Susquehanna or either of its branches, shall, in lieu of the compensation now by law allowed, be entitled to a reasonable compensation for all necessary services and expenses in taking up and securing the same, and for advertising it in the manner now by law prescribed.

Sect. 4. That every justice, with whom a list of any such lumber, &c., shall be lodged, shall keep a record of his proceedings in the case ; and he and the constable shall be entitled to the same fees as are now by law provided for similar services.

Sect. 5. That the provisions of this act shall apply to any lumber, logs, shingles, shingle-bolts or timber, which may lodge upon any islands in the Susquehanna river, or its branches, and be advertised according to existing laws, by the owner of such island.

Sect. 6. That all laws, or parts of laws, inconsistent with this act, are hereby repealed; Provided, that the provisions of this act shall not apply to logs, timber, shingles or shingle-bolts, or other property taken up by any incorporated boom company in the Commonwealth.

On the 10th of April 1862, an act was passed enacting that persons engaged in lumbering on the West Branch of the Susquehanna or any of its tributaries should adopt a mark, and stamp with it their lumber to be put into the stream to be driven to any boom at or above Williamsport, and file the mark with the prothonotary of Lycoming county ; that no person should stop lumber so marked above Williamsport ; that if any lumber floats upon any land above the Williamsport boom, the owner may enter upon the land and take it, first paying the damage, &c., and if it be not

[Craig *v.* Kline.]

claimed within three months, it shall be forfeited to the owner of the land, he first to advertise, &c.,

By this Act, the Acts of 1812, 1853 and 1855 were repealed, " so far as relates to any of the several kinds of lumber mentioned in the first section of this act, having thereon a duly registered mark as aforesaid, in and along the streams and their tributaries mentioned in the first section of this act."

On the 7th December 1799, the legislature of the state of Maryland passed an act to incorporate a company for the purpose of making a canal between the river Delaware and the Chesapeake Bay. The 18th section of that act provides, " That this law shall be of no force or effect until a law be passed by the state of Delaware authorizing the cutting of the canal aforesaid; and until a law shall be passed by the state of Pennsylvania, declaring the Susquehanna river a public highway, and authorizing individuals and bodies corporate to remove obstructions therein, at a period not exceeding three years from the 1st of March 1800." By another Act of the Legislature of Maryland, of 16th December 1812, it is enacted, " That if the United States subscribe 750 shares of stock, Pennsylvania 350, and Delaware 100, then the Treasury of the western shore of Maryland was to subscribe 250 shares." On the 19th February 1801, the legislature of Pennsylvania passed an act, declaring that the river Susquehanna, down to the Maryland line, shall be a public highway, any act or law of the Commonwealth notwithstanding. And it shall and may be lawful for the Chesapeake and Delaware Canal Company, or any other body corporate, or individuals, to remove all natural and artificial obstructions therefrom. (3 Smith's Laws 464). In 1825, the assent of Congress was given to these acts, and the Secretary was authorized to subscribe money to finish the canal.

The plaintiffs submitted these points:—

1. The defendants cannot hold the logs in dispute by virtue of the provisions of the Act of 11th December 1866, because the act is unconstitutional and void.

2. The defendants, having failed to comply with the directions and requisites of the Act of 1812 and its supplements, cannot hold the logs by virtue of having taken them up upon the river.

3. The defendants cannot detain the logs for the purpose of securing and indemnifying themselves for any alleged damages incurred by reason of the logs having lodged upon their islands or otherwise.

4. If the court shall answer to the 2d proposition above stated, that the 2d section of the Act of 1866 is independent of the Act of 1812, and that the defendants are not bound to show a compliance with the direction of the Act of 1812, or so in substance, then the court is requested to charge the jury that only logs " that

[Craig v. Kline.]

are found floating loose in said stream" may be taken up, and that the statute does not include such logs as lodged upon the islands, and were taken from there by defendants.

5. The proper measure of damages is the value of the logs and lumber, at the place where they were when the writs were served, and not their value at the time and place when and where they were taken into possession by defendants.

The court answered:—

" 1. We cannot answer this point as requested. The act referred to is constitutional, and under it, defendants may hold the logs captured afloat on the river, but not those lodged on the islands.

" 2. Answered in the negative.

" 3. Answered in the affirmative.

" 4. The Act of 1866 only applies to logs found floating loose in the stream, and not to those lodged upon the islands. The plaintiffs may, therefore, recover the value of the logs lodged upon the island and taken by the defendants.

" 5. Under the circumstances of this case, we cannot answer this point as requested. The logs were upon the cultivated islands of defendants. They took them, doubtless, under an honest belief that they were legally entitled to them, and, under these circumstances, we think that the proper measure of damages would be the value of the logs, as they were lying upon the island, with interest on their value from the time plaintiffs converted them to their own use."

The defendants' points were:—

1. The Act of 19th February 1801, * * * so far as it attempts to alienate either to a state or company the jurisdiction of the said state of Pennsylvania so as to prevent said last-mentioned state from enacting and executing laws which merely police the stream, and regulate its navigation for the common benefit of all persons interested, either in the navigation of the stream itself or for the protection of the owners of real estate in and along said stream, is unconstitutional and void.

2. The Act of 11th December 1866, section 2, does not prohibit the navigation of the river Susquehanna, but simply regulates the navigation thereof for the common benefit of all those desiring to use the stream for traffic, &c., and also protects the owners of property in and along said stream; and, while it imposes a reasonable restriction, for the common good, that all persons may the more fully enjoy their rights, under a wholesome police regulation, there is no denial of the right of navigation to any. That the loss of property to those who refuse to obey the act, as to the manner of floating logs, is not in violation of either the Federal or State Constitutions, because the proviso gives such violator of the law two months from time of capture, *within which* he may

[Craig *v.* Kline.]

claim and pay fifty cents per log, whereupon the captor must surrender up the property to the owner, and he is reinvested with the title thereto, the act operating as a limitation upon his rights, and not as a forfeiture of his property without trial by due course of law, and operates not upon the rights, but upon the remedy, and the title acquired by the captor is founded simply on a limitation of the adverse remedies, and is constitutional, and within the power of the legislature to enact.

3. If the jury believe that the plaintiffs voluntarily caused the logs in dispute to be floated down the river Susquehanna between the town of Northumberland and the line of the state of Maryland, without the same being rafted and joined together or enclosed in boats, and without being under the control, supervision and pilotage of men especially placed in charge of the same, and *actually thereon,* and the logs lodged on islands in said river, or on other lands of defendants, or on islands or other lands of those from whom defendants purchased a portion of these logs, or were captured afloat by defendants, and that plaintiffs, neither by themselves nor their agents, appeared within two months after these logs were seized by defendants, or those under whom defendants claim, and from whom they purchased the logs, and claimed these logs and paid, or offered to pay, fifty cents per log, then the plaintiffs are barred from recovery in this action, and the verdict must be for the defendants.

4. It being admitted by plaintiffs that they voluntarily threw the logs in dispute into the main river Susquehanna, at Northumberland, without joining the logs together in rafts, and without persons in charge of the same and actually thereon, with the intent and design of floating or driving said logs loosely to their sawmills below the line of the state of Maryland, this was in violation of the 2d section of the Act of 11th December 1866, and against law, and said logs having landed or lodged on the islands of the defendants, the plaintiff could not enter upon said islands to remove the logs, except as trespassers, and the logs having afterwards been removed by defendants to their mill-pond, the plaintiffs cannot recover them in this action, and the verdict of the jury must be for the defendants.

The court answered:—

" 1. We do not consider the act referred to unconstitutional, nor do we consider it interferes with the right of Pennsylvania to regulate navigation of the Susquehanna river, so far as it may be to the interest and benefit of the public and those using the stream for the transportation of their goods and commodities.

" 2. Answered in the affirmative.

" 3. We say to you, that so far as the logs in controversy were captured by defendants when floating upon the river, there can be

[Craig *v.* Kline.]

no recovery.   As to the logs taken from the islands, the plaintiffs are entitled to recover their value, as before stated.

"4. We decline answering this point as requested."

The court further said :—

"* * * Under the admitted facts and undisputed evidence in the case, the defendants acquired title to the logs captured by them when floating loose in the river—if the Act of 11th December 1866 is constitutional. * * *

"The logs taken up by the defendants, floating loose in the river, not being demanded within two months from the date they were taken up, they were forfeited to, and became the property of, the captors, and the plaintiffs cannot recover their value."

In No. 18 the verdict was for the plaintiffs for $684.32 ; in No. 88 the verdict was for the plaintiffs for $394.16.

The plaintiffs took out a writ of error in No. 18.

The defendants took a writ of error in each case.

All the writs of errors were argued together in the Supreme Court.

The plaintiffs in the suit assigned for error the answers of the court to their 1st, 2d and 5th points, and to the defendants' 2d and 3d points and to the portions of the charge given above.

*A. C. Simpson* and *S. Linn* (with whom were *C. J. T. McIntire, Black* and *Meredith*), for plaintiffs in error.

*S. G. Thompson* and *B. F. Junkin,* for defendants in error.

The opinion of the court was delivered, July 7th 1870, by

AGNEW, J.—It is a difficult problem now to define the boundaries of state and Federal powers.   The doctrine of the rights of states pushed to excess culminated in civil war.   The rebound caused by the success of the Federal arms threatens a consolidation equally serious.   In this condition the landmarks of the Constitution, as planted by Chief Justice Marshall and his associates on the solid ground of reason, and a due regard to the rights of the states and of the Union, constitute the only safe guides of decision.   The power of Pennsylvania to legislate upon the navigation of the river Susquehanna, which is the question in this case, involves a Federal power exceedingly intimate in its relations to the subjects of state sovereignty.   The power to "regulate commerce with foreign nations and among the several states, and with the Indian tribes," "cannot stop (says Marshall, C. J.) at the external boundary line of each state, but may be introduced into the interior."   It comprehends "*navigation* within the limits of every state of the Union, so far as that navigation may be in any manner connected with commerce," either foreign or interstate, and "may therefore pass the jurisdictional lines of the states, and

[*Craig v.* Kline.]

act upon the very waters" to which state legislation applies: Gibbons *v.* Ogden, 9 Wheat. 1. But while thus asserting the great extent of the Federal power, the opinion concedes to the state an "immense mass of legislation which embraces everything within the territory of a state not surrendered to the General Government, all which can be most advantageously exercised by the states themselves. Inspection laws, quarantine laws, health laws of every description, as well as laws regulating the internal commerce of a state, and those which respect turnpike roads, ferries, &c., are component parts of this mass." These and others not enumerated constitute police powers—such as are exercised in the passage of laws to promote the peace, safety, good order, health and interests of the state, and are protected by the 9th and 10th articles of the amendments to the Constitution of the United States. The powers reserved to the states (says the 45th number of The Federalist) will extend to all the objects which in the ordinary course of affairs concern the lives, liberties and property of the people, and the internal order, improvement and prosperity of the state. Or, as said by McLean, J., "all powers which properly appertain to sovereignty, which have not been delegated to the Federal Government, belong to the states and the people:" New Orleans *v.* United States, 10 Peters 737 ; and see Willson *v.* Blackbird Creek Marsh Co., 2 Peters 245 ; License Cases, 5 How. 582–3, 592.

But though this large field of state power is conceded, a difficulty arises sometimes in relation to its subjects when they become the objects of the exercise of the Federal power also. Thus says Mr. Story, in his work on the Constitution : " A state may use the same means to effectuate an acknowledged power in itself which Congress may apply for another purpose. Congress may make that a regulation of commerce which a state may employ as a guard for its internal policy, or to preserve the public health or peace, or to promote its peculiar interests." An illustration will be found in the case of Willson *v.* Blackbird Creek Marsh Co., 2 Pet. 245, in which the authority of a law of Delaware was questioned. The plea stated the creek to be a navigable highway, in which tide ebbed and flowed, and the argument insisted that the law of the state conflicted with the power to regulate commerce. But its validity was sustained on the ground that the erection of the dam was necessary for the benefit of the citizens of Delaware, and not opposed to any law of Congress, none having been passed to regulate such streams; and in the expressive language of Chief Justice Marshall, it was not repugnant to the power to regulate commerce in its *dormant* state. This distinction, in regard to the exercise of the power by Congress, is important as coming from the distinguished author of the opinion in Gibbons *v.* Ogden, sometimes quoted to carry the power

[Craig v. Kline.]

of Congress further than it was intended by him to advance it—to the extent indeed of holding that a state cannot exercise its power over a subject within the power to regulate commerce, whether Congress has legislated on the same subject or not. This opinion is not sustained by the case cited from 2 Peters, or later authorities, and is strongly combated by Chief Justice Taney in the License Cases, 5 How. 578 *et seq.*, who refers to that case and others to show that it was not the opinion of Chief Justice Marshall that the mere grant of a power to the General Government is to be construed as an absolute prohibition to the exercise of any state power over the subject of it. The question may be considered as now settled in conformity to the opinion of Chief Justice Taney, by the case of Cooley v. The Board of Wardens of Philadelphia, 12 How. 318, which holds the grant of the power to regulate commerce is not exclusive, but that the question in each case depends on the character of the subject, some requiring it to be treated as exclusive and others not so: Opinion of Curtis, J.

But without standing on what some may regard as debateable ground, it seems to be clear that when a state exercises her own sovereign power in a matter involving the interests of her citizens, though it may touch upon a subject within the field of the power to regulate commerce, it is not for that reason invalid if it conflicts with no law Congress has passed upon the same subject. Thus pilot laws, though regarded as directly affecting a subject of commerce, have been held to be valid: Cooley v. Board of Wardens, 12 How. 299; Pacific Steamship Co. v. Joliffe, 2 Wall. U. S. 450. So a law of Maryland forfeiting vessels engaged in catching oysters in an unlawful manner in the Chesapeake Bay is not invalid, though the vessel was duly enrolled and licensed under the Acts of Congress, and employed in the coasting trade. A law of New York, requiring the masters of vessels coming into port from abroad to make report within twenty-four hours of the names, places of birth, of last legal settlement, age and occupation of the passengers, was decided to be good as an exercise of the police power: City of New York v. Miln, 11 Pet. 102. In the License Cases, 5 How. 504, the laws of Massachusetts, Rhode Island and New Hampshire were held not to be repugnant to the Constitution of the United States. A tax in Louisiana on brokers of foreign bills was held not to be repugnant: Nathan v. Louisiana, 8 How. 73. See also Weaver v. Fegely, 5 Casey 27—weights and measures; White v. Commonwealth, 4 Binn. 418; Fox v. Ohio, 5 How. 410—counterfeiting United States coin. Analogies also will be found in reference to the power over the militia: Houston v. Moore, 5 Wheat. 1. The power to establish uniform bankrupt laws: Sturgis v. Crowningshield, 4 Wheat. 196. To enact naturalization laws: Chirac v. Chirac, 2 Id. 269.

[Craig *v.* Kline.]

We come now to the particular question involved in this case, to wit: the power of our legislature to prohibit the floating of loose saw-logs in the Susquehanna river, between the town of Northumberland and the Maryland state line, "without the same being rafted and joined together or enclosed in boats, and under the control, supervision and pilotage of men especially placed in charge of the same, and actually thereon." Act December 11th 1866, § 2, Pamph. L. 1867, App. 1366. This act evidently concerns not only the police power, but the right of eminent domain of the state. It was said by Taney, C. J., in Martin *v.* Waddell, 16 Peters 410, that—"when the Revolution took place the people of each state became themselves sovereign, and in that character hold the absolute right to all their navigable waters and the soils under them for their common use, subject only to the rights since surrendered by the Constitution to the General Government." This language was repeated by McKinley, J., in Pollard *v.* Hagan, 3 Howard 229. The Constitution of the United States confers no power of eminent domain or of legislation over state territory, except that contained in the 16th clause, 8th sect., 1st art., relating to the seat of government and places purchased with the consent of the state for forts, magazines, &c. Hence it was said by the court in the case last cited, that, even if Georgia had in her compact of cession to the United States of the territory of Alabama granted the municipal right of sovereignty and eminent domain, "such stipulation would have been void and inoperative, because the United States have no constitutional capacity to exercise municipal jurisdiction, sovereignty, or eminent domain within the limits of a state or elsewhere, except in the cases in which it is expressly granted." Hence it was held in that case that the shores of navigable waters and the soils under them were not granted by the Constitution of the United States, but were reserved to the states respectively, and that Alabama, though a new state, had after admission the same rights, sovereignty, and jurisdiction over the subject as the original states. This was reaffirmed in Gilman *v.* Philadelphia, 3 Wallace 713. The practice of the states in their exercise of the power of eminent domain, and their right to improve the navigable streams within their boundaries, has conformed to these principles. Each has assumed at pleasure to dam, slackwater, improve the natural channels and bridge these streams, when the interests of the people have made it necessary, in the absence of any Act of Congress to abridge its power. These streams and their navigation have always been deemed to be subject to the regulating or police power of the state for the protection of the people and of internal commerce, when not in conflict with any Act of Congress passed under the power to regulate commerce. Pennsylvania has exercised these rights in the improvement of the navigation of the Delaware, the Susquehanna and the Monon-

[Craig *v.* Kline.]

hela rivers; as well as the Schuylkill, Lehigh, &c.   The character of these public rights will be found to be discussed in Carson *v.* Blazer, 2 Binn. 475; Shrunk *v.* Schuylkill Nav. Co., 14 S. & R. 71; Susq. Canal Co. *v.* Wright, 9 W. & S. 9; Mon. Nav. Co. *v.* Coons, 6 Id. 101.   These state decisions underwent review in Rundle *v.* Del. and Raritan Canal Co., 14 Howard 80, in which the power of Pennsylvania and New Jersey as joint sovereigns over the Delaware was sustained, and it was held that a license to an individual over its waters was revocable and held in subjection to the *superior right of the state to divert the water for public improvements.*   The state authority is strongly sustained in the power to bridge these large streams: Penna. *v.* Wheeling Bridge Co., 18 Howard 430; Gilman *v.* Philad, 3 Wallace 713; Passaic Bridge, 3 Wallace 782; Flanagan *v.* Philada., 6 Wright 231.   In the first case, of the Wheeling Bridge, 13 Howard 519, the illegality of the structure was placed on the ground that Congress had already legislated on the subject, by sanctioning the compact between Virginia and Kentucky, making the navigation free and common to all citizens of the United States.   In the second case, in 18th Howard, *supra,* it was said the principle is undoubted that the Act of Virginia conferred authority to erect and maintain the bridge, subject to the exercise of the power of Congress to regulate the navigation of the river.   The more recent case of Gilman *v.* Philada., *supra,* reasserts distinctly the principles stated in Pollard *v.* Hagan and Willson *v.* Blackbird Creek Marsh Co., *supra.*   On the subject of ferries, Conway *v.* Taylor, 1 Black 603, settles conclusively the power of the state to grant this franchise on navigable streams.   From these principles and authorities it appears to be clear that the Act of 11th December 1866 was a lawful exercise of the police power of the state upon a subject within her rightful jurisdiction, for the protection of the navigation of the Susquehanna; and not being repugnant to any law of Congress passed to regulate commerce on this river, it is valid and constitutional.

The court below having sustained the position of the plaintiffs, that the legislation of Maryland and Pennsylvania created a contract between these states, that the Susquehanna is a public highway to the Maryland line, and that any corporation or individuals should have authority to remove all natural and artificial obstructions therefrom; we pass to the next question.   The plaintiffs assert that the modern mode of driving by floating logs loosely in the stream, and following after them to dislodge those that are stranded, has become a recognised mode of navigation, and therefore that the Act of 1866 infringes the contract between the states. This is not strictly correct.   Driving, as it is called, is chiefly confined to the West Branch of the Susquehanna, where booms have been provided by law for catching the logs and delivering them to

[Craig *v.* Kline.]

their owners.   The very driving referred to is itself regulated by law, and is therefore no disproof of the power of the state to regulate the navigation.   But a contract to preserve the free and public navigation of the river is not infringed by proper regulations which promote the very purpose of the navigation by making it safe and convenient to all, and preventing it from being monopolized and dominated by a few.   According to the evidence this mode of using the river is productive of great injury both to the riparian owners and those navigating the river with arks, rafts, boats, &c.   In this case 200,000 logs were collected at a point on the river called Davits, to be floated down to the mills of the plaintiffs below the Maryland line, and after being set afloat were overtaken by a freshet.   The effect is thus described by the learned judge in his charge:  " Witnesses," he says, " describe the consequences of this drive of logs, overtaken by the flood, as ruinous to the defendants and others owning property along the river.   The cultivated islands of the defendants and others were covered with logs, the trees which protected the banks uprooted or broken.   The logs carried over and upon them, formed dams at the head of the island, causing channels to be cut through the grain-fields, of fifty feet in width, the length of the island, and logs carried out upon the meadows and low lands adjoining the river, to the distance of a fourth of a mile from the usual channel.   In addition to the injury to private property as described by the witnesses, some (who have been pilots on the river for fifteen or twenty years, and experienced in running rafts) say they would not consider it safe to undertake to run a raft with a drive of 200,000 logs floating loose upon the river.   Some describe the imminent danger to which they have been exposed.   That they can neither land at night, go through the chutes in the dams, nor along the narrow channels when logs are floating thick in the river.   Witnesses who saw the drive of 1868 say that an ordinary raft could not have lived among the logs; and that they have known rafts detained till in the fall season in consequence of loose logs floating so that they could not safely venture out into the river."

Clearly such a use of the river is improper, and conflicts with the rights of others: Dubois *v.* Glaub, 2 P. F. Smith 238.   We think the state, in the exercise of her sovereign authority and police power, had a right to forbid such a mode of using the stream.

The next question is, whether the mode of forfeiture provided in the law is valid.   The 2d section of the Act of 1866 forfeits the title of the owner, if the logs be found floating loose in the stream and not in the personal charge of some one upon them, and vests it in the captor, at the expiration of two months, if the owner do not appear within that time and pay the captor 50 cents for every log taken up.

[Craig v. Kline.]

If this means that a forfeiture can take place without notice, as the court below held, and without an opportunity of being heard on the question whether the owner had voluntarily set his logs afloat loose upon the stream, then it seems to us to be contrary to the provision in the bill of rights, that no one shall be deprived of his property unless by the judgment of his peers, or the law of the land. The law of the land means by due process of law : 2 Kent's Com. 13* ; Sedgwick on Stat. and Const. Law, ed. 1857, 610 ; Murray's Lessee v. Hoboken Land Company, 18 Howard 276. It does not mean merely an act of the legislature, for that would abrogate all restriction on legislative power : 2 Kent 13* in note. The design of the Convention (says Gibson, C. J.) was to exclude arbitrary power from every branch of the government ; and there would be no exclusion of it, if such rescripts or decrees were allowed to take effect in the form of a statute : Norman v. Heist, 5 W. & S. 173. This provision and those as to the administration of justice in the bill of rights, require that all claims for justice between man and man, shall be tried, decided and enforced by the judicial authority of the state and by due course of law ; Per Lowrie, J., Menges v. Dentler, 9 Casey 495 ; in Greene v. James, 2 Curtis 189, cited in Sedgwick on Stat. and Const. Law, p. 611, Justice Curtis, in the Circuit Court of the United States, held that an Act of Rhode Island authorizing a seizure of property in an unlicensed tippling shop was in violation of the Constitution of the state, because it did not provide for notice by due legal means of the nature and cause of the accusation, nor for a trial of the question whether the liquors were held for sale in violation of law. The provision in the Constitution of Rhode Island is in the same language as that in our own. This subject was discussed in Fetter v. Wilt, 10 Wright 460, in reference to the Act of 22d April 1822, to prevent the disturbance of meetings held for religious worship ; though the point in the case was not decided, Thompson and Woodward, JJ., holding the law to be unconstitutional. Now it is very clear that the mere fact that a man's property is found floating down the stream, is not *ipso facto* a ground of forfeiture, so as to deprive him of title. It is the intentional or voluntary act of floating, directing or authorizing to be floated, which the law prohibits. For aught the captor or the public may know the logs might have been carried off by a flood, or by the illegal acts of trespassers. In Doctor and Student, ch. 51, it is said, " though a man waive the possession of his goods and saith he forsaketh them, yet by the law of the realm, the property remaineth still in him, and he may seize them after, when he will." And see Story on Bailments 55, 59, 85, 86, 87. It is evident therefore that title cannot be divested by the mere fact of the property being found floating on the stream. That may justify seizure to answer the supposed offence. But to for-

[Craig *v.* Kline.]

feit the title, the owner must have notice, and an opportunity of showing that his property was not voluntarily set afloat on the stream contrary to law. The court below erred therefore in holding that the title to the logs found afloat was divested without notice. And we think also that there was error in holding that the provision for notice in the Act of 1812 is repealed. Evidently it is not repealed by the Act of 10th April 1862, § 7, P. L. 286, as the repealing clause applies only to the stamped lumber mentioned in the first section put into the Susquehanna at or above the boom at Williamsport. Nor is it repealed by the third section of the Act of 11th December 1866, repealing all laws and parts of laws inconsistent with the provisions of that act. There is not a word in the act inconsistent with that part of the Act of 1812, § 1, which requires the "person taking up such lumber floating down the waters of the said river to lodge a list by him subscribed, within thirty days thereafter with the nearest justice of the peace of the town or township where such lumber was taken up, of the number, quality and quantity of logs, &c., with the marks of the same," and requiring the justice to enter the same on his docket, and to cause the same to be published at least three weeks in one weekly newspaper of the county wherein such lumber was taken up." Then the first section of the Act of 1866 declares it to be the true intent and meaning of the first section of the Act of 1812 : " That any saw-logs may be taken up *under the provisions of said section,* whether the same be put into the streams intentionally or otherwise, and whether the same be floated intentionally or otherwise : the true intent and meaning thereof being that *no saw-logs may be floated or driven* therein *unless rafted and under the pilotage* and control *of men,* and *that all saw-logs not so rafted and under the pilotage and control of men, shall and may be taken up under the provisions thereof.*"

Thus the Act of 1866 expressly directs that logs floated loosely in the stream not under the control of men (and which the 2d section proceeds to prohibit, and declare a consequent forfeiture of the logs), shall be taken up under the provisions of the 1st section of the Act of 1812. And without this plain language the identity of the subject of legislation and the necessity of notice to make the law valid, require us to hold that the Act of 1812 and its supplements are to be construed in *pari materia* with the Act of 1866.

The only objection that can be urged against the charge as to the measure of damages is, that the court assumed that the logs were captured by the defendants under an honest belief that they were forfeited—a matter rather for the jury. The action of replevin lies wherever one man claims goods in the possession of another without regard to the manner in which possession was obtained. But it is equally well settled that upon the question of

[Craig *v.* Kline.]

damages the means by which possession has been taken or retained will be considered. Hence exemplary damages may be given when there has been outrage in the taking or vexation and oppression in the detention, and on the other hand, an innocent mistake in the taking or detention may reduce the damages to mere compensation. This subject was fully examined in Herdic *v.* Young, 5 P. F. Smith 176. The court below held that the logs grounded on the islands were not liable to capture and forfeiture under the 2d section of the Act of 1866. Still it was a question for the jury, whether the defendants had not made an innocent mistake in not proceeding according to the Act of 1812. Primâ facie, the value of the property when and where it is replevied is the measure of compensation; but this may be varied by the circumstances as to the character of the taking and the removal to the place of the replevy.

Judgment reversed, and a *venire de novo* awarded.

The defendants, under their writs of error, assigned for error the answers of the court to their 3d and 4th points. They were argued by

*S. G. Thompson* and *B. F. Junkin,* for plaintiffs in error.

*A. C. Simpson* and *S. Linn* (with whom were *C. J. T. McIntire, Black* and *Meredith*), for defendants in error.

The opinion of the court was delivered, July 7th 1870, by

AGNEW, J.—The main questions arising in this case have been considered and disposed of in the writ of error of Craig & Blanchard *v.* Kline: Opinion just read. In the present writ of error the only question is upon the right of the defendants to take up the logs found lying upon the islands and not afloat. We have said in the other writ of error that the 2d section of the Act of 1866 must be taken in connection with the former acts on the same subject, and that the proceedings and notice required by the Act of 1812, as altered and modified by its supplements, are applicable to seizures of logs under the Act of 1866. The defendants had a right to take up the logs lying on the islands under the Acts of 1812, 1853, and 1855, as explained by the 1st section of the Act of 1866. But having failed to comply with their provisions as to the mode of taking up the logs, the plaintiffs were entitled to recover, so that substantially the instruction of the court led to the correct result; and the judgment is affirmed.