Public Utilities Commission,
No. 4852.

PENNICHUCK WATER WORKS *v.* STATE.

Argued September 8, 1960.

Decided October 28, 1960.

50

*Sulloway, Hollis, Godfrey & Soden (Mr. Hollis* orally), for the plaintiff.

*Louis C. Wyman,* Attorney General, and *Frederic T. Greenhalge,* Assistant Attorney General (*Mr. Greenhalge* orally), for the State of New Hampshire.

BLANDIN, J. This appeal presents to the court the issue of whether, the Commission having decided that the company was entitled to the protection of temporary rates, acted reasonably in not applying its temporary rate order to service rendered during the first quarter of 1960. The company has not appealed to the Commission's failure to prescribe a higher level of temporary rates. The test to determine whether the plaintiff's appeal should be

sustained is to inquire if we are satisfied by a preponderance of the evidence before us that the order of the Public Utilities Commission was unjust or unreasonable. *Public Service Co.* v. *State*, 102 N. H. 66, 71; RSA 541:13.

RSA 378:27, 29 are pertinent here and provide in substance that the Commission, if the public interest requires it, may fix temporary rates. These must yield not less than "a reasonable return." *Id.*, s. 27. The temporary rates are effective until the final determination is made unless they are sooner terminated by the Commission. If the final rates are in excess of the temporary rates, the utility can recoup by a temporary increase in rates over the rate finally determined "such sum as shall represent the difference between the gross income obtained from the rates prescribed in such temporary order and the gross income which would have been obtained under the rates finally determined if applied during the period such temporary order was in effect." *Id.*, s. 29.

At the outset, it may be observed that no one has appeared to object either to the company's originally filed rates or to its petition for temporary rates which it seeks to have go into effect retroactively as of January 1, 1960. Furthermore, on the record before us, it is indisputable that from January 1, 1960 on, the plaintiff will receive less than a reasonable rate of return, even though a full tax abatement is obtained, unless increased rates are awarded to it. On the uncontradicted evidence before us, the actual rate of return in 1959, under the impact of increased taxes, was 4.93%. In 1960, it is anticipated there will be an increase of $16,666 in operating costs, some of which were met before the Commission issued its order of March 25, 1960. These, plus substantial construction expenditures which will result in an increased rate base, will bring in an earned rate of return for the year well below 4.93%, absent a reduction in taxes. The evidence showed that had the proposed rates been in operation for the entire year of 1959, the plaintiff would have earned 6.05%. Since the increased revenue under these proposed rates about equals the increase in taxes, it follows that even if a tax abatement should be granted down to the 1958 level, the rate of return in 1959 on the present temporary rates, which are set at the same level as those in effect prior to the filing of the petition on January 29, 1960, would have been about 6%. Obviously, with increased costs of operation and added construction expenditures, the rate of return in 1960

will fall substantially below 6%, and this, of course, applies to the first quarter of the year.

Other undisputed evidence showed that the cost of capital presently invested in the business is approximately 6.40% and that the cost of additional required capital, composed of 50% debt and 50% equity, will be 6.75%. It thus appears that the 6% rate of return or less which will probably be realized for the last three quarters of 1960 is below the cost of money. This, we have held, is not a fair rate of return, as the cost of money "marks the minimum rate of return to which the company is entitled." *New Eng. Tel. & Tel. Company* v. *State*, 95 N. H. 353, 361; see also, *Chicopee Mfg. Co.* v. *Company*, 98 N. H. 5, 11. The majority of the Commission found that "the establishment of currently effective rates as temporary rates for the duration of this proceeding would be just and equitable." Commission Report, March 25, 1960. These rates, due to increased costs, are calculated to produce a return of less than 6%, if applied to the entire year of 1960. The minority report would grant greater increases to the plaintiff on the ground that it is currently "earning less than a fair return, and less than its cost of money." Report of *dissenting* Commissioner, March 25, 1960.

On the above evidence and the findings of the majority as well as the minority of the Commission, it is clear that for the first quarter of 1960, with no right to recoup under the statute, due to increased expenses the company will earn less than a fair rate of return even if it receives all the tax rebate it has requested. · This loss, which cannot be recouped, obviously will not be made up during the remaining three quarters of the year while the temporary rates are in force. Should it fail in its tax appeal in its entirety or in large measure, the plaintiff's deficiency for the first quarter of 1960, which also cannot be recouped or made good during the remaining three quarters of the year, will be very substantial. In these circumstances no good reason appears why the plaintiff should not also be entitled to recoup any deficiency in its return for the first quarter of the year.

However in this situation, the defendant advances a number of arguments in support of the order of the Commission. Among others it suggests that the company, having chosen to request an abatement rather than to file solely for higher rates, cannot complain if its choice has worked to its disadvantage. The plaintiff's election to petition for a tax abatement rather than immediately to ask solely

for higher rates seems as much for the benefit of its customers as for itself, since a lower tax appraisal of the property will be reflected favorably in the return. No reason appears in justice why the utility should suffer because of its choice of remedies. In the present situation, if the final rates set by the Commission are lower than the temporary schedule, the customers will be repaid under RSA 378:29. On the other hand, if the rates for the first quarter of 1960 remain pegged at their present level while rates for the balance of the year are increased retroactively, the plaintiff will suffer losses for this period which it cannot recoup.

In seeking to support the Commission's order, the defendant lays stress on the fact that the utility recently sold a tract of land at a substantial profit which was credited to nonoperating revenue. It argues that this land, with a book value of $1,250, was included in the rate base for previous years and the taxes upon it were deducted from operating revenue in determining the rate of return. However, when it sets the final rate the Commission will consider the amount of taxes of which the plaintiff is relieved on this property, as well as the amount by which the rate base will be lessened, so that the consumers will get the benefit. Furthermore, the profits realized from the sale of a capital asset as a matter of "general equity . . . belong to the stockholders. If [the land] had been sold at a loss, the deficit could not be charged to future consumers. By the same token a profit cannot be awarded future consumers." *Chicopee Mfg. Co.* v. *Company,* 98 N. H. 5, 13-14. It follows that the defendant's argument that the gain realized by the sale of this land is a persuasive reason to deny the plaintiff relief, cannot be sustained.

The defendant also takes the position that the long-term debt of the company exceeds its depreciation reserves by only about $75,000, that it was probably incurred to finance purchases of plant, and that by annual operating charges for depreciation, ultimately charged to the ratepayer, the company has recovered practically all its long-term debt. It goes on to argue that prudent management would establish an asset fund account and a corresponding reservation of earned surplus which would increase yearly and be used for plant replacement so that the ratepayer would not have to carry both annual depreciation expenses and also the cost of refinancing the long-term debt. There is no evidence in the record to support the defendant's assumption as to the reason why the debt was incurred. Also, it is well established that matters

of policy as to the methods of operating the business are, within the bounds of reason, the prerogative of management. *Public Service Co.* v. *State*, 102 N. H. 150, 161; *New England Tel. & Tel. Co.*, 115 Vt. 494, 510; *Central Maine Power Co.* v. *Public Utilities Commission*, 153 Me. 228; 73 C. J. S., Public Utilities, s. 40.

Furthermore, the defendant's argument is basically fallacious. The purpose of depreciation charges is to preserve intact the original investment. The assets of the utility are constantly being used up in the production of the service which it furnishes. If these are not replaced, the business is in effect being gradually liquidated. The assets retained in the enterprise as a result of depreciation charges and equivalent to the reserve for depreciation may be used either to repay indebtedness or for the replacement of the worn out or obsolete equipment. They cannot be used for both. If the utility expends these funds to pay off debt, it must find new money to replace equipment. If it has to raise new money by means of the issuance of stock the dividend cost presumably will be greater than that on its bonds and the consumer is worse off than before, since he must bear the burden of this higher cost.

In short, it must be recognized that the utility, and therefore those whom it serves, must bear the expense of both depreciation and the cost of capital. It cannot avoid either. It follows that the defendant's argument, in effect that the consumer can escape one or the other of these burdens, cannot be maintained.

There was evidence that the average pay-out ratio on the company's common stock was high and that the current dividend rate is $1.20 per share, which amounts to an actual dividend of about 5.4 per cent. This, the defendant asserts, is not an unreasonable dividend scale. However this may be, the fact remains that for the year 1960 the company will receive less than a reasonable rate of return under the present order of the Commission, and we do not believe the dividend rate a sufficient reason for denying the plaintiff a reasonable rate of return for the first quarter of 1960.

Another contention advanced by the defendant for sustaining the Commission's order is that the beginning of the second quarter billing period would be "an orderly and convenient point at which to make the temporary rates effective," that the rate proceeding must at some time be brought to a close (*Public Service Co.* v. *State*, 102 N. H. 66, 71) and by a parity of reasoning such proceedings should have a definite and convenient point of beginning. Conceding that this is so, we see no practical difficulty in making

the order effective for the first quarter of 1960, and while it is true that the date of orders of this sort should satisfy practical considerations, no good reason appears why January 1, 1960, would not have fulfilled this requirement.

The defendant finally argues that an order by the Commission in March, 1960, permitting the company to collect for services from January 1, 1960, on would be retroactive, possibly beyond the Commission's authority, and at variance with its practice. We do not believe this position is well taken. The statute plainly recognizes that retroactivity may be desirable on occasion. RSA 378:27, 29. Rule 22 of the Public Utilities Commission provides: "Unless otherwise expressly provided, rates established by a new tariff or revised pages shall be used in the rendering of bills based on meter readings, the latter of which is taken on or after the effective date stated in the new tariffs or revised pages." On several previous occasions, orders of the Commission have been upheld by this court, which were retroactive in effect for periods up to at least a month. *Public Service Co.* v. *State*, 102 N. H. 150. The Commission itself, in other cases which have not been before us, has made retroactive orders. See *In re Exeter & Hampton Electric Co.*, XXXIII N. H. P. S. R. *p.* 351, order 6024. It is unnecessary to determine here what limits may exist as to the length of retroactivity permissible under RSA 378:27, 29. In view of the company's practice of billing quarterly, we do not believe that these limits would be exceeded by an order establishing temporary rates which would have a retroactive effect for a single quarter.

In conclusion, it appears that the consumers will suffer no irreparable or substantial injury if the presently effective temporary rates are made retroactive to include service furnished for the first quarter of 1960. On the other hand, the plaintiff will incur losses which cannot be recouped if this is not done. On the record before us, we are satisfied by a preponderance of the evidence that the order of the majority of the Commission should be set aside. RSA 541:13. See also, *Public Service Co.* v. *State*, 102 N. H. 66, 70.

*Remanded.*

All concurred.