**BRIDGEPORT HYDRAULIC COMPANY et al., Plaintiffs,**

v.

**The COUNCIL ON WATER COMPANY LANDS OF the STATE OF CONNECTICUT et al., Defendants.**

Civ. No. B–75–212.

United States District Court, D. Connecticut.

Dec. 29, 1977.

On Plaintiff's Motion to Vacate Judgment June 19, 1978.

944

Clifford R. Oviatt, Gary A. MacMillan, Warren W. Eginton, Cummings & Lockwood, Stamford, Conn., for plaintiffs.

Donald F. Keefe, Joseph C. Lee, J. Michael Sulzbach, Tyler, Cooper, Grant, Bowerman & Keefe, New Haven, Conn., for intervening plaintiff New Haven Water Co.

Noel R. Newman, Bridgeport, Conn., for Town of Fairfield and John J. Sullivan, as First Selectman of Town of Fairfield.

Paul E. Pollock, Keith D. Dunnigan, Bai, Pollock & Dunnigan, Bridgeport, Conn., for Town of Newtown, and F. R. DeLucia, Town of Westport and Jacqueline P. Heneage.

Frederick F. Ehrsam, Bridgeport, Conn., for Town of Oxford, and J. R. Untied as First Selectman.

William J. Curran, Bridgeport, Conn., for City of Shelton and F. X. Kelley, Mayor of Shelton.

J. Peter LaChance, Town Atty., Westport, Conn., for Town of Weston and Barbara Wagner, First Selectman.

Raymond E. Baldwin, Jr., Dion W. Moore, Pullman, Comley, Bradley & Reeves, Bridgeport, Conn., for Town of Redding and Jesse P. Sanford, First Selectman.

Ralph L. Palmesi, Bridgeport, Conn., for Town of Trumbull and James A. Butler, First Selectman.

Carl A. Ajello, Atty. Gen., Frederick D. Neusner, William B. Gundling, Robert S. Golden, Jr., Asst. Attys. Gen., Hartford, Conn., for Council on Water Company Lands, Public Utilities Commission, Howard E. Hausman, as Chairman of PUC and as Member of Council and Dept. of Finance & Control, Horace Brown, as Director, Dept. of Health, Douglas Lloyd, as Commissioner, Dept. of Environmental Protection, Joseph N. Gill, as Commissioner, R. Loew, S. Richards, M. Lightfoot, as Members of Council etc.

David B. Losee, Donald R. Holtman, Connolly, Holtman & Losee, West Hartford, Conn., for Town of Litchfield and Robert D. Cooley, as First Selectman.

Richard S. Bruchal, Town Counsel, Ansonia, Conn., for Town of Seymour and Anna L. LoPresti, as First Selectman.

Richard L. Nahley, Danbury, Conn., for City of Danbury and Charles A. Ducibella.

Stephen C. Gallagher, Danbury, Conn., for Town of Bethel and Francis Clarke.

Edward W. Manasse, Smith, Cornell, Smith & Mettling, Torrington, Conn., for Town of Canaan.

Haynes N. Johnson, Stamford, Conn., for all intervening defendants.

James T. B. Tripp, East Setauket, N. Y., Peter B. Cooper, New Haven, Conn., for Environmental Defense Fund, Natural Resources Defense Council, Connecticut Conservation Ass'n and Conservation Law Foundation, amici.

Eric N. Wellman, Danbury, Conn., for City of Danbury and Donald W. Boughton, Mayor.

Before SMITH, Circuit Judge, and ZAMPANO and NEWMAN, District Judges.

## MEMORANDUM OF DECISION

ZAMPANO, District Judge:

This action challenges the constitutionality of certain statutes and regulations affecting public utility companies which were enacted by the State of Connecticut during the last five years. The claim is made that these enactments have substantially impaired, if not destroyed, the effective management of these companies and have usurped their property for the general public benefit without just compensation, in violation of the Fifth and Fourteenth Amendments of the United States Constitution.

The plaintiffs are five private, investor-owned Connecticut water companies (Litchfield, Norfolk, North Canaan, Lakeville and Cornwall Water Companies), their parent company (Bridgeport Hydraulic Company), and its holding company (The Hydraulic Company). The New Haven Water Company was permitted to intervene as a plaintiff solely with respect to Count IV. The defendants include the Council on Water Company Lands ("Council"), the Public Utilities Control Authority ("PUCA"), the Departments of Finance and Control, Health, and Environmental Protection, and numerous towns of the State in which the plaintiffs own real estate.

The six-count complaint, as amended, seeks declaratory and injunctive relief pursuant to the provisions of 42 U.S.C. § 1983, with jurisdiction premised on 28 U.S.C. §§ 1331 and 1343. Because an injunction restraining the enforcement of state statutes and regulations on grounds of unconstitutionality is sought, a three-judge dis-

trict court was convened under 28 U.S.C. §§ 2281 and 2284.[1]

## I

The plaintiffs first assert that the enforcement of Public Act 75–405, the so-called Moratorium Act, in effect since June 25, 1975, and extended for another two-year period by the 1977 legislature, Public Act 77–606, deprives them of their property without due process of law.

The Act empowers the Council to undertake certain activities, including *inter alia* :

1) The promulgation of criteria for determining whether any water company lands should be considered surplus property with due regard given to the purity and adequacy of present and future water supply and whether any such surplus lands may be suitable for recreation or open space use;

2) The establishment of policies and procedures to assist municipalities in acquiring the surplus lands for community use;

3) The issuance of recommendations concerning executive and legislative action governing the disposition of water company property; and

4) The development of provisions for the long term acquisition of the surplus lands by the State or municipalities, and for a restriction of the percentage of land within a given municipality which a water company may sell in a specified period without approval.

In addition, Section 2(a) of the Act placed a two-year moratorium, with certain limited exceptions,[2] on the development or sale of all parcels of unimproved real property in excess of three acres owned by water companies. As stated, the moratorium was extended for another two years by the legislature on June 26, 1977.

The plaintiffs contend that this statutory scheme is confiscatory in its operation and constitutes a taking without just compensation. They point out, among other things, that they own thousands of acres of land which in their opinion are presently or after the installation of filtration facilities will no longer be useful to the water supply business. They argue that their plans to dispose of this property at substantial gains over the original cost and book value are effectively blocked by the legislation and, therefore, they have become uncompensated custodians of *de facto* public land in contravention of the protections of the Fifth and Fourteenth Amendments. Cf. *Pumpelly v. Green Bay Company,* 80 U.S. (13 Wall.) 166, 177–178, 20 L.Ed. 557 (1871); *Trager v. Peabody Redevelopment Authority,* 367 F.Supp. 1000, 1002 (D.Mass.1973) (three-judge court).

Certain controlling principles guide our determination of the issue presented. Subject to specific constitutional limitations, the enactments in question come to us clothed with a presumption of validity. *United States v. Vuitch,* 402 U.S. 62, 70, 91 S.Ct. 1294, 28 L.Ed.2d 601 (1971); *Bibb v. Navajo Freight Lines,* 359 U.S. 520, 529, 79 S.Ct. 962, 3 L.Ed.2d 1003 (1959). To be sustained, legislative regulatory pronouncements in the public interest need only be found to be within the perimeters of what traditionally is known as the state's police power. *Berman v. Parker,* 348 U.S. 26, 32, 75 S.Ct. 98, 99 L.Ed. 27 (1954). In the exercise of that power, the legislature has broad and flexible authority, particularly in the areas of public health and safety. *Goldblatt v. Hempstead,* 369 U.S. 590, 595, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962); *Village of Euclid v. Amber Realty Co.,* 272 U.S. 365, 391, 47 S.Ct. 114, 71 L.Ed. 303 (1926). So long as the legislation bears a real and substantial relation to a legitimate state purpose and the means of enforcement are reasonable, judicial intervention is not war-

---

1. Because this action was commenced before August 12, 1976, the applicability of 28 U.S.C. § 2281 is not affected by the repeal of that statute by Public Law No. 94–381, 90 Stat. 1119, August 12, 1976.

2. The Act exempts development of such land for utility and certain public recreational uses. Also, lands subject to the moratorium may be sold upon the written approval of the Council and the chief executive officer of the municipality in which the land is located.

ranted. *Village of Belle Terre v. Boraas*, 416 U.S. 1, 8, 94 S.Ct. 1536, 39 L.Ed. 797 (1974); *Sproles v. Binford*, 286 U.S. 374, 388, 52 S.Ct. 581, 76 L.Ed. 1167 (1932); *Maher v. City of New Orleans*, 516 F.2d 1051, 1058–1059 (5 Cir. 1975).

 Applying these standards, it is evident that the statutes before us reflect a permissible exercise of the police power and not an arbitrary interference with private rights. While it is true that the moratorium on the sale of water company lands may affect the plaintiffs' opportunities to reap immediate net profits, that fact alone fails to give rise to any constitutional infirmity. As stated in *Day-Brite Lighting, Inc. v. Missouri*, 342 U.S. 421, 424, 72 S.Ct. 405, 408, 96 L.Ed. 469 (1952): "Most regulations of business necessarily impose financial burdens on the enterprise for which no compensation is paid. Those are part of the costs of our civilization." The overriding consideration is the State's power to regulate the disposition of plaintiffs' lands—to the limited extent set forth in the legislation at issue—while acting in furtherance of its desire to preserve and insure the quality of one of its most crucial resources.

At the outset we note that the enactments under review do not prohibit the sale of plaintiffs' lands absolutely. Water companies are free to seek an exception to the moratorium on sales by requesting the written approval of the Council and the chief executive officer of the municipality in which the property is located. Neither may withhold permission arbitrarily or unreasonably; both must accord the plaintiffs due process of law with respect to any application to sell a particular parcel of land. See Uniform Administrative Procedure Act, Conn.Gen.Stat. § 4–166 *et seq.*; *Gohld Realty Co. v. Hartford*, 141 Conn. 135, 146, 104 A.2d 365 (1954).

In any event, the expansive record before us demonstrates that the obvious purpose of the legislation is the protection of the health and welfare of the State's inhabitants. By providing that there can be no massive divestitures of watershed and off-watershed lands the State is insuring the ability of the water companies to provide pure water to its customers.

Both watershed and off-watershed properties are critical to water purity. Watershed areas reduce the impact of point and non-point sources of pollution [3]; off-watershed lands act as a buffer zone to reduce risk of contact with these pollution sources. Thus any significant sales of a water company's properties do present the potential for seriously reducing the existing protections of the State's water supplies. Moreover, it is evident that such sales might include subsequent commercial development which could endanger the remaining water supply areas by creating an increase in the amount of pollutants potentially capable of being washed into those supplies.

In response, the plaintiffs submit that no health hazards will be created by their contemplated sales because they rest assured that their water treatment facilities more than adequately protect the public and that any sale of property must pass muster before the Department of Health under other statutes and regulations. See, e. g., Conn. Gen.Stat. § 25–32(b). However, the record discloses that there is considerable controversy over the effectiveness of present water treatment facilities and the adequacy of the present guidelines utilized by the Department of Health. The extensive testimony of experts and documentary evidence presented to this Court clearly demonstrate that innumerable factors must be considered and weighed in order to resolve the dispute concerning the feasibility of the sales of water company lands. The place for a definite determination of the controversy is the legislature and not the judiciary. Cf. *East New York Bank v. Hahn*, 326 U.S. 230, 234, 66 S.Ct. 69, 90 L.Ed. 34 (1945).

**3.** Non-point sources of pollution are polluting agents that do not arise from a particularly identifiable source or point. Examples include lawn and crop fertilizers and pesticides, road salt, and vehicle emissions. Point sources of pollution are sources that are more easily identifiable such as septic tanks, sewage fields, and industrial waste.

We are also persuaded that the procedures designated in the legislation are reasonable. The enactments, passed after studious debate, carefully address the problem of the nature and sufficiency of the existing water supplies in relation to land divestiture plans and construction of filtration projects proposed by the State's water companies. Specific areas for research, surveys and investigations are set forth; detailed reports pursuant to ascertainable standards are required to be submitted to the legislature. Pending remedial legislation, the temporary restrictions imposed on the sale of water company lands merely safeguard against potential dangers envisioned by the legislature. We find no cogent reason to reverse the considered judgment of the legislature to preserve to a limited extent the status quo of water company lands while it studies in greater detail the feasibility of protective legislation for the future.

We therefore, conclude that the legislation in question falls within the permissible scope of the State's police power and does not unconstitutionally trench on plaintiffs' protected interest. Cf. *Williamson v. Lee Optical Co.*, 348 U.S. 483, 487–488, 75 S.Ct. 461, 99 L.Ed. 563 (1955); *East New York Savings Bank v. Hahn*, supra; *Pacific States Box and Basket Co. v. White*, 296 U.S. 176, 185–186, 56 S.Ct. 159, 80 L.Ed. 138 (1935); *Walls v. Midland Carbon Co.*, 254 U.S. 300, 319, 41 S.Ct. 118, 65 L.Ed. 276 (1920).

## II

The plaintiffs' attack on the Option Statute, as amended by the legislature in 1975, Conn.Gen.Stat. § 16–50d, presents a troublesome issue of statutory construction.

The purpose of the statute, first enacted in 1967, was to establish a procedure whereby the State or a municipality had the first "option" to purchase land in excess of three acres being offered for sale by a public service company before that parcel could be sold to a private party on the open market. Excluding stated time limitations, the statutory scheme provided that: 1) the company was required to give notice of its intention to sell the land to the Public Utilities Commission (the predecessor of the PUCA), the Commissioner of Environmental Protection, and the chief executive officer of the municipality in which the property was located; 2) the PUC would then approve or disapprove the sale; 3) if the sale were approved, the State and municipality had the option to acquire the land; and 4) if the option were exercised by either of the governmental bodies, the parties had a specified period of time to agree upon a price or the matter would be referred to the condemnation process.

Each step set forth in the Option Statutes contained a designated time span for action, with express provisions for waiver if the State or municipality failed to act within the limitation periods. From time to time since 1967, the legislature changed these time requirements. Prior to the 1975 Amendments, the PUC had 150 days to approve or disapprove the sale and, if approved, the State or municipality had 90 days to exercise its option to buy. Thus the company's plans for the sale of the property could not be delayed more than 240 days or eight months due to the operation of the Option Statute. Since it was unlikely that expert appraisals would radically change within an eight-month span, the plaintiffs have no quarrel with a disruption of their sales program for this period of time.

However, in 1975 the legislature revised the procedures under the Option Statute as follows: 1) after the initial notification of an intention to sell land by a public service company, the PUCA has five months to approve or disapprove, § 16–50c; 2) if there is an approval, the State or municipality has three months to indicate a desire to obtain the property, § 16–50d(a); 3) a failure to thus exercise the option to purchase results in a waiver of the right to acquire the land, § 16–50d(b); 4) upon notice of an exercise of the option, the company "within eighteen months . . . shall sell the land to the municipality or the state, as the case may be, . . . or, if the parties cannot agree upon the amount to be paid therefor, the municipality or the state may proceed

to acquire the land in accordance with the procedure prescribed in section 48–12 [condemnation]", § 16–50d(c); and 5) "if the municipality or the state fails to acquire the land or to prefer a petition [for eminent domain] within ninety days" after the § 16–50d(a) notice, the governmental body waives its right to acquire the property, § 16–50d(d).

It is clear that the 1975 Amendments grant the PUCA five months to approve or disapprove the proposed sale under § 16–50c, and, in the event of approval, allow the governmental bodies three months to consider the feasibility of purchase under § 16–50d(a). However, it is also obvious that the remaining subsections of the statute, which govern actual acquisition of the property, are facially ambiguous and inconsistent. Subsection (c) declares that the State or municipality has 18 months after the preliminary study period of eight months to obtain the property by sale or condemnation, while subsection (d) recites that the State or municipality waives its right to acquire the land if it fails to acquire the property by sale or condemnation within three months following the eight-month study period.

The plaintiffs contend that the 1975 Amendments now permit a possible delay of 26 months (eight months for study plus 18 months to acquire) from the date of the initial decision to sell land to the time the sale must be consummated. They submit impressive evidence that the 26-month period is unreasonable and effectively destroys the marketability of their property. As stated by Mr. Donald Loiselle, one of plaintiffs' experts:

> Appraisals are always made at the current market value as of the date made. Two years from that date the appraisal is no longer valid. If the market continues to ascend the way it has in the past many years, the appraisal will be too low at the end of the 26 month period, so that we cannot sell at the appraised price unless we want to sell below market and our mortgage indenture says we have to sell at current market value in order to get

the land freed from the mortgage indenture, so we get into a vicious circle on this.

Loiselle Deposition at 66–67.

■ While the plaintiffs interpretation logically conforms to the language of four provisions of the statute (sections 16–50c, 16–50d(a), 16–50d(b) and 16–50d(c)), it renders nugatory the three-month mandate of subsection (d). It is axiomatic that a court should not construe a statute in a way that emasculates one of its provisions, cf. *Marsano v. Laird*, 412 F.2d 65, 70 (2 Cir. 1969); see also *United States v. Menasche*, 348 U.S. 528, 538–539, 75 S.Ct. 513, 99 L.Ed. 615 (1955), or that may result in a finding of unconstitutionality in its operation. *Quinn v. Butz*, 166 U.S.App.D.C. 363, 373, 510 F.2d 743, 753 (1975); *Lee Fook Chuey v. Immigration & Naturalization Service*, 439 F.2d 244, 249 (9 Cir. 1971); cf. *Knapp v. McFarland*, 462 F.2d 935, 939 (2 Cir. 1972).

The defendants, on the other hand, do not seriously contest that a 26-month option period would be unjust, illogical and arbitrary. (Defendants' Brief at 35). However, they assert that the amendments permit only an 11-month option time. The two-fold argument is that: 1) subsection (d) requires the State or municipality to make a legally binding commitment to exercise the option within three months following the eight-month study period; and 2) the additional 15 months under subsection (c) is available solely to work out "ministerial" problems, including price, bonding, etc. Although this analysis would save the statute from constitutional infirmity, it blinks at reality. Price and terms are hardly "ministerial" in nature—they involve the most critical components of a contract to purchase land. In addition, the defendants' rationale completely disregards the explicit language of subsection (c) which mandates a sale or a petition for condemnation "within eighteen months" after subsection (a) notice. It is a settled maxim of statutory construction that all provisions of an enactment are intended to have meaning, and words of a statute are not to be construed as surplusage. Cf. *McDonald v. Thompson*,

305 U.S. 263, 266, 59 S.Ct. 176, 83 L.Ed. 164 (1938); *Wilderness Society v. Morton*, 156 U.S.App.D.C. 121, 135, 479 F.2d 842, 856 (*en banc*), cert. denied, 411 U.S. 917, 93 S.Ct. 1550, 36 L.Ed.2d 309 (1973). We also note that the legislative history of the amendment to subsection (c) is meager and furnishes no definitive reference to aid in the resolution of the conflict. Compare *United States v. Amer. Trucking Ass'ns*, 310 U.S. 534–544, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940); *Schwartz v. Romnes*, 495 F.2d 844, 849 (2 Cir. 1974).

■ Under these circumstances, we find there are valid reasons to invoke the doctrine of abstention. First, it is evident that to adjudicate the federal constitutional claim, we must fix the extent of the acquisition term for the State and municipalities under the Option Statute. Since the statute is susceptible to varying constructions which would significantly alter the nature of the constitutional question, a decision by the state court will undoubtedly obviate the need for a federal judgment. *Bellotti v. Baird*, 428 U.S. 132, 96 S.Ct. 2857, 49 L.Ed.2d 844 (1976); *England v. Louisiana Board of Medical Examiners*, 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964); *Railroad Comm'n v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941); *Reid v. Board of Education of the City of New York*, 453 F.2d 238 (2 Cir. 1971); *Hamar Theatres, Inc. v. Cryan*, 393 F.Supp. 34 (D.N.J.1975).

Second, a decision by this Court concerning whether the governmental bodies have a total of 11 or a total of 26 months to acquire water company properties would have a considerable impact on the overall statutory scheme and would implicate a federal forum in a particularly difficult and delicate sphere of state regulation that could cause a "possible disruption of complex state administrative processes." *Zwickler v. Koota*, 389 U.S. 241, 249 n. 11, 88 S.Ct. 391, 396, 19 L.Ed.2d 444 (1967); see also *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 814, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). The legislature has expressed a broad interest in

the disposition of lands owned by public service companies. Major competing and conflicting considerations are involved. Notions of equity, comity and federalism require that a state and not a federal tribunal balance the relevant factors necessary to an interpretation of the statute which fulfills the intent of the legislature and avoids a constitutionally impermissible result. Cf. *Harris Commissioners Court v. Moore*, 420 U.S. 77, 83, 95 S.Ct. 870, 43 L.Ed.2d 32 (1975).

Finally, we perceive no undue hardship occasioned by abstention here. No sale of property is pending between a plaintiff and a governmental body which would be affected by the operation of the Option Statute. Ample time without prejudice exists for the plaintiffs to allow the state courts to construe the provisions of their own statute in a manner consistent with the federal constitution. We also recognize the probability that the legislature will act in the meantime to correct the manifest ambiguity in the statute.

### III

The plaintiffs next allege that §§ 6(a), 6(b) and 12 of the 1975 PUCA Act, Conn. Gen.Stat. §§ 16–8(a), 16–8(b) and 16–32a, grant such sweeping powers for State regulation of public service companies that they destroy the rights of private management and constitute a virtual seizure of the companies' business enterprises. Cf. *Pewee Coal Co. v. United States*, 88 F.Supp. 426, 115 Ct.Cl. 626 (1950), aff'd, 341 U.S. 114, 71 S.Ct. 670, 95 L.Ed. 809 (1951). These provisions empower the PUCA 1) to summon and examine witnesses and to direct the production of documents needed in the performance of its duties or in connection with any hearing, § 16–8(a); 2) to conduct "management audits" to determine whether a company's operations are "inefficient, improvident, unreasonable, negligent or in abuse of discretion" and, if so, to order the affected company "to adopt such new or altered practices and procedures as the [PUCA] shall find to be necessary to promote efficient and adequate service to meet the pub-

lic convenience and necessity," § 16–8(b); and 3) to impose a management practice of requiring competitive bidding in appropriate cases where the contract price exceeds $50,000, § 16–32a.

■ While it is true that many areas of company business should best remain within the jurisdiction of management, it must also be recognized that it is logical and permissible for the legislature to be concerned with management practices of public service companies which affect the public interest and welfare. Cf. *Midwestern Gas Transmission Co. v. Federal Comm'n,* 388 F.2d 444, 448 (7 Cir.), cert. denied, 392 U.S. 928, 88 S.Ct. 2286, 20 L.Ed.2d 1386 (1968). From its very inception in 1911, the Public Utilities Commission was intrusted with the duty to "keep fully informed as to the . . manner of operation of all public service companies" and was authorized "[to] order . . . such changes in the manner of operation, as may be reasonably necessary for public safety . . . ." Public Acts of 1911, ch. 128. This section was later incorporated into the 1949 Revision of the General Statutes as § 16–11 and states in pertinent part as follows:

> The commission shall . . . keep fully informed as to the . . . manner of operation of all public service companies in respect to their adequacy and suitability to accomplish the duties imposed upon such companies by law and in respect to their relation to the safety of the public and of the employees of such companies. The commission may order such reasonable improvements . . . or such changes in the manner of operation, as may be reasonably necessary in the public interest.

■ We view the 1975 Amendments in question as nothing more than supplemental exercises of the PUCA's powers and duties existent in the Connecticut General Statutes with respect to the PUC for over 65 years. The obvious purpose of the new provisions is to establish additional procedures to insure a high quality of utility service for the general protection of the public, the ratepayers, and the stockholders'

investments in the companies. These interests serve a real and legitimate State purpose, see, e. g., *Village of Belle Terre v. Boraas,* supra; *Sproles v. Binford,* supra; *Maher v. City of New Orleans,* supra. It seems to us to be quite reasonable that the PUCA be empowered to utilize its expertise to evaluate the efficiency of the companies' operations and, when necessary, to interpose regulatory directives in the public interest. Cf. *Midwestern Gas Transmission Co. v. Federal Power Comm'n,* supra at 448.

Contrary to the plaintiffs' allegations, there is no unbridled control of the companies' internal affairs delegated to the PUCA by the legislation. The boundaries of the PUCA's permissible action are clearly marked by the enactments. With respect to § 16–8(b), the PUCA cannot commence proceedings against an affected company unless an audit reveals that the internal workings of the company are wasteful and inefficient, and, only after notice and a hearing, is the PUCA then authorized to issue an order requiring the company to adopt practices to remedy the mismanagement. Court review is available to the affected company under the Uniform Administrative Procedure Act, Conn.Gen.Stat. § 4–183, to test the PUCA's adherence to the statutory standards, to determine the fairness of the administrative hearing, and to review the rationality of any order issued by the PUCA which requires any alteration of the company's internal affairs.

Similar considerations sustain the validity of § 16–32a. Before it can act, the PUCA must first determine by investigation whether competitive bidding of public service contracts in excess of $50,000 would be likely to reduce costs without impairing quality, continuity or dependability of service. If there is an affirmative finding, there must be notice and a hearing before the PUCA may promulgate regulations to govern procurement practices for the utility industry in this State. Each step of these administrative proceedings is subject to judicial review pursuant to the provisions of the Uniform Administrative Procedure Act.

We conclude, therefore, that these enactments are an authorized delegation of legislative power, that the standards prescribed are self-limiting and precise, and that basic due process rights are accorded by ready access to judicial review.[4] Cf. *Yakus v. United States*, 321 U.S. 414, 423–427, 64 S.Ct. 660, 88 L.Ed. 834 (1974).

## IV

The plaintiffs, joined by the intervenor, also vigorously contest the constitutional validity of the 1972 Amendments to the Uniform System of Accounts. These Amendments significantly altered the accounting treatment to be accorded to gains and losses on the sale of land owned by water companies. To place the issues in perspective, it is necessary to review briefly the functions of the Uniform System of Accounts in the ratemaking process and the major elements of a utility's accounting methods.

The Uniform System of Accounts, first promulgated in 1922, essentially has a two-fold function. First, it requires a water company to follow a uniform accounting procedure for the filing of annual reports to the PUCA under Conn.Gen.Stat. §§ 16–27 and 16–28. These yearly reports enable the PUCA to be informed of the financial condition of each company in the State, make comparisons among the companies, analyze the status of the entire industry within Connecticut, and issue appropriate regulatory decisions in the best interests of the companies, the shareholders and the public. Second, it provides for a financial overview of the company's business so that the PUCA has the necessary data for the regulation of utility service rates. When a company seeks a rate adjustment, its applica-

tion to the PUCA must comply with the accounting format set forth in the Uniform System of Accounts to demonstrate the financial need for the rate increase. Obviously, therefore, the accounting system mandated by the enactment plays an important role in the PUCA's decisionmaking process.

One basic exhibit that must be submitted in an application for a rate adjustment is an income statement which must reflect, among other things, the company's "operating income," i. e., the amount of operating revenues remaining after payment of operating expenses. Before 1972, the Uniform System of Accounts did not require the gains or losses from the sale of nondepreciable property to be reported as one of the items influencing the operating income of the utility. Rather, these gains or losses were credited or charged, as appropriate, to the "earned surplus" account, i. e., that portion of a company's earnings which legally can be paid out as dividends to stockholders or reinvested in additional property. Hence, gains or losses accrued directly to the benefit or detriment of the shareholders and did not affect the ratemaking process.

After the passage of the 1972 Amendments, gains or losses on the disposition of land could no longer be attributed to the earned surplus account, but instead had to be considered on the income statement as an "above the line" entry.[5] This new requirement affects the computation of the company's operating income which, in turn, influences the ratemaking process. For example, any gain realized on the sale of property could now be used to offset the amount of operating expenses, thereby reducing the total gross revenue needed to produce the allowed level of operating in-

---

4. We also reject plaintiffs' contention that Conn.Gen.Stat. § 16–22 unconstitutionally requires them to assume the burden of proof that a transfer of their property must be shown to be in the public interest. We consider the enactment to be a lawful exercise of the State's police power. Cf. *Southern Conn. Gas Co. v. Public Utilities Comm'n*, 158 Conn. 626, 265 A.2d 82 (1969).

5. "Above the line" accounts represent events and transactions that constitute a portion of the ordinary utility operations and are accounted for as an element of utility operating income. "Below the line" accounts represent events and transactions which constitute all other business operations of the utility company and are accounted for, together with above the line income, as an element of net income from all operations.

come. Thus, with less gross income required, lower rates could be charged to the utility's customers.

The question presented, therefore, is whether a gain on the sale of a company's nondepreciable asset should inure to shareholders as capital surplus, or to ratepayers as a reduction in the cost of service.

The plaintiffs and intervenor contend that a utility's shareholders have a vested right to gains from the appreciated market value of capital assets and that, as a consequence, any diversion of profits from the investors to the ratepayers arising from the sale of land constitutes a "taking" without just compensation. They point out that the investors and not the consumers have a legal and equitable interest in the company's property, cf. *Board of Public Utility Commissioners v. New York Telephone Co.*, 271 U.S. 23, 32, 46 S.Ct. 363, 70 L.Ed. 808 (1926), and, since the shareholders previously bore the risk of loss from the possible decline in the value of the utility's land, it is only fair and reasonable that the investors reap the benefit of a capital gain on the sale of that property. Cf. *Pennichuck Water Works v. State of New Hampshire*, 103 N.H. 49, 164 A.2d 669 (1960).

▮ The defendants, on the other hand, maintain that no justiciable case or controversy has been presented for our review and that any decision on the constitutional question framed by the plaintiff and intervenor would be premature. Cf. *Coffman v. Breeze Corporations*, 323 U.S. 316, 324, 65 S.Ct. 298, 89 L.Ed. 264 (1945). It is uncontroverted that as a general rule proceeds from land sales are received and retained by the company and may be used for dividend distribution or for reinvestment. It is only when the company seeks a rate adjustment that these proceeds are considered in determining the amount of revenues required from the ratepayers. Even in those cases where capital gains may be a factor in the ratemaking process, the PUCA has discretion either to treat the proceeds as above the line entries on the income statement in order to reduce rates paid by consumers, or to permit the funds to "flow through" the income statement to the earned surplus account without affecting the rate authorization. In either event, there is no abuse of discretion by PUCA unless the shareholders fail to receive a fair return on their investment. Cf. *Federal Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591, 603, 64 S.Ct. 281, 88 L.Ed. 333 (1944); *Federal Power Comm'n v. Natural Gas Pipeline Co.*, 315 U.S. 575, 590, 62 S.Ct. 736, 86 L.Ed. 1037 (1942); *Bluefield Waterworks & Improvement Co. v. Public Service Comm'n*, 262 U.S. 679, 692–693, 43 S.Ct. 675, 67 L.Ed. 1176 (1923). The present record presents no concrete set of facts which demonstrate that the passage of the 1972 Amendments has caused the shareholders to receive less than such fair return. Since we are without power to render advisory opinions or decide hypothetical questions, the defendants' argument is persuasive that we should decline "to decide [a] constitutional question in advance of the necessity for its decision." *Federation of Labor v. McAdory*, 325 U.S. 450, 461, 65 S.Ct. 1384, 1389, 89 L.Ed. 1725 (1945).

Another contention of the defendants merits serious attention. The Johnson Act, 28 U.S.C. § 1342, provides as follows:

The district courts shall not enjoin, suspend, or restrain the operation of, or compliance with, any order affecting rates chargeable by a public utility and made by a State administrative agency or a rate-making body of a State political subdivision, where:

(1) Jurisdiction is based solely on diversity of citizenship or repugnance of the order to the Federal Constitution; and,

(2) The order does not interfere with interstate commerce; and,

(3) The order has been made after reasonable notice and hearing; and,

(4) A plain, speedy and efficient remedy may be had in the courts of such State.

The plaintiffs and intervenor contend that, although the four conditions of the

Act are met,[6] the Act is inapplicable for two reasons. First, it is asserted that the 1972 Amendments are regulations of a general nature and are not within the narrow confines of the statutory language of an "order affecting rates." Though the terms "order" and "regulation" may have significantly different meanings in the context of judicial review of administrative actions, there is no clear indication that Congress intended to use the denomination "order" in its more restrictive sense.

We believe the proscription of the Act reaches the issues at bar. One purpose of the Act was "to prevent forum-shopping by utilities between State and Federal courts, a practice that had bedeviled the administration of the rate structures of the various states." *Tennyson v. Gas Service Company*, 506 F.2d 1135, 1138 (10 Cir. 1974). Another was "to keep constitutional challenges to orders affecting rates out of the federal courts 'lock, stock and barrel,' or, as Professor Moore succinctly puts it, to effect a 'general hands-off policy relative to state rate making.'" *Id.* These purposes are particularly served here because the validity of the 1972 Amendments is currently under consideration in two cases pending in the state courts. The provisions of the Uniform Administrative Procedure Act, Conn.Gen.Stat. § 4–166 *et seq.*, more than adequately afford the plaintiffs and the intervenor protection from any possible infringement of their rights by the PUCA's application of the 1972 Amendments to their rate applications. Federal judicial review is therefore inappropriate.

Second, it is urged that the Act is applicable solely to cases requesting injunctive relief and not to those seeking a declaratory judgment. We agree with the rationale expressed in the *Tennyson* case, supra, rejecting this identical claim. See also *Klotz v. Consolidated Edison Co. of New*

*York,* 386 F.Supp. 577, 585 (S.D.N.Y.1974). Cf. *Samuels v. Mackell,* 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971).

## V

The plaintiffs' final federal claim focuses on the cumulative effect of the 1975 Amendments. It is argued that the overall impact of the legislation results in an unreasonable confiscation of their property and seriously impairs their rights under the Contract Clause of the Constitution, Art. I, § 10. Since we reach the merits of only two of the challenged provisions, the "overall impact" argument loses considerable force, and we find it unavailing.

We again emphasize that the plaintiffs, unlike other private corporations, are public purpose entities. They have been specially franchised by the State to supply communities with "an abundant supply of pure water for public and domestic use." (Stip. Ex. 12–18). Thus it seems clear that the State may impose reasonable land use controls upon them which may differ materially from those impressed upon other private property owners. The record reasonably supports the legislature's fear that any massive disposition of watershed properties would endanger the public health and welfare. The 1975 Amendments exhibit the legislature's comprehensive response to a potential evil which cannot be deemed to be constitutionally impermissible under the Fifth and Fourteenth Amendments. Cf. *Permian Basin Area Rate Cases,* 390 U.S. 747, 768–772, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968); *Williamson v. Lee Optical Co.,* supra, 348 U.S. at 487–488, 75 S.Ct. 461.

We also conclude that, although the legislation restricts the plaintiffs' right to enter contracts for land sales, the guarantees of the Contract Clause have not been abrogated. One of the special benefits ex-

---

**6.** The moving papers indicate that: 1) jurisdiction is based solely on a claim that the 1972 Amendments are repugnant to the Federal Constitution; 2) no argument is made that the rates for intrastate sales of water interfere with interstate commerce; 3) the 1972 Amendments were enacted after due notice and a hearing;

and 4) the state courts provide a speedy and efficient remedy for the causes advanced by the plaintiffs and intervenor; and indeed, had the parties concentrated their efforts on the litigation presently pending in the state courts, the issues at bar would probably have long been resolved in that forum.

tended to public service companies is the grant of eminent domain power. Conn. Gen.Stat. § 25–42. It is of little consequence that the plaintiffs have utilized condemnation proceedings sparingly over the years; the ability of the companies to resort to condemnation undoubtedly was an effective tool in persuading private land owners to sell land. It therefore seems reasonable that the State, having delegated to public service companies a valuable part of its governmental prerogative to obtain land by eminent domain, should retain broad flexible authority to regulate and even delay any large abandonment of those companies' properties by open market sales. Economic, health and safety concerns justify the exercise of continuous and dominant police power by the State to safeguard against improvident management decisions of public service companies.

## VI

Lastly, since we have disposed of all the federal constitutional claims on grounds previously stated, we dismiss the remaining pendent state claim set forth in Count VI of the complaint. *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *McFaddin Express, Inc. v. Adley Corp.*, 346 F.2d 424, 427 (2 Cir. 1965), cert. denied, 382 U.S. 1026, 86 S.Ct. 643, 15 L.Ed.2d 539 (1966).

Accordingly, it is ORDERED:

1. That all causes of action alleged in the plaintiffs' and intervenor's complaints, except with respect to the so-called Option Statute, are dismissed;

2. That we abstain from a determination of the constitutional validity of the Option Statute to enable the parties to institute proceedings in the courts of the State of Connecticut. Failure to seek relief in a state forum within 60 days will be ground for dismissal by this Court. *Government Employees v. Windsor*, 353 U.S. 364, 366, 77 S.Ct. 838, 1 L.Ed.2d 894 (1957); *Blount v. Mandel*, 400 F.Supp. 1190, 1202 (D.Md.1975).

## PLAINTIFFS' MOTION TO VACATE JUDGMENT AND ENTER FINAL JUDGMENT

Pursuant to Rule 60(b)(6) of the Federal Rules of Civil Procedure, plaintiffs The Hydraulic Company, Bridgeport Hydraulic Company and Bridgeport Hydraulic Company's five subsidiary water companies respectfully move the Court to vacate its judgment filed in this action on January 23, 1978. The reason for this motion, as more particularly set forth in the affidavit of Warren W. Eginton annexed hereto, is that in the judgment of January 23, 1978 this Court reserved decision on the plaintiffs' challenge to *Connecticut General Statutes* § 16–50d (the "Option Statute") and retained jurisdiction over that aspect of this case upon certain conditions set forth in paragraph 2 of that judgment. On June 7, 1978 Connecticut Public Act 378 was enacted. That Act substantially revises the Option Statute and renders moot plaintiffs' constitutional attack upon the Option Statute. Therefore, those portions of the judgment of January 23, 1978 by which this Court retained jurisdiction over the challenge to the Option Statute are no longer necessary, and that judgment should be vacated and a new judgment should be entered in the form annexed thereto.

s/ Warren W. Eginton
Warren W. Eginton
Attorney for Plaintiffs
CUMMINGS & LOCKWOOD
1 Atlantic Street
P.O. Box 120
Stamford, Connecticut 06904

Defendants hereby consent to the relief requested by the plaintiffs in the foregoing motion and the entry of a judgment in the form annexed thereto.

CARL R. AJELLO
Attorney General of the
State of Connecticut

Bys/ Frederick D. Neusner
Frederick D. Neusner
Assistant Attorney General
30 Trinity Street
Hartford, Connecticut 06115

## ORDER

The foregoing motion is hereby granted. The judgment of this Court filed herein on January 23, 1978 is hereby vacated. Plaintiffs shall submit to this Court a judgment in the form annexed to the foregoing motion.