(No. 45024.—

CHICAGO ALLIS MFG. CORP. *et al.,* Appellants, v. THE METROPOLITAN SANITARY DISTRICT OF GREATER CHICAGO, Appellee.

*Opinion filed October 2, 1972.*

LEE A. MONROE, of Chicago (SIDLEY & AUSTIN, of counsel), for appellants.

ALLEN S. LAVIN, of Chicago (FRED F. HERZOG and SANFORD R. GAIL, of counsel), for appellee.

MR. JUSTICE WARD delivered the opinion of the court:

On April 14, 1971, the plaintiffs, seventeen companies with plants located within the jurisdiction of the Metropolitan Sanitary District of Greater Chicago, brought an action for declaratory judgment against the District in the circuit court of Cook County, contending that section 7a of the Sanitary District Act (Ill.Rev.Stat. 1971, ch. 42, par. 326a), and the Industrial Waste Surcharge Ordinance, which had been enacted under the statute by the District, violate the constitutions of Illinois and the United States. At the conclusion of the plaintiffs' case, the court allowed the District's motion for judgment. The appeal of the plaintiffs has been presented to this court under the provisions of our Rule 302(b). 50 Ill.2d R. 302.

The challenged statute (Ill.Rev.Stat. 1969, ch. 42, par. 326a) in subsection (a) forbids "*** any industrial or manufacturing plant to discharge into the sewers or works of the Sanitary District or into any sewer connected therewith, any waste matter of any nature whatever resulting from or the residue of any industrial or manufacturing operation or process carried on in such plant, where the mixture of such waste matter, sewage and water discharged by such industrial or manufacturing plant into such sewers or works equals in any twelve-month period an aggregate volume of three million, six hundred fifty thousand (3,650,000) gallons." Subsection (b), however, empowers the district, "*** in the interest of public health and safety, to permit the discharge into the sewers and works of the Sanitary District and into sewers connecting therewith from any industrial or manufacturing plant, a mixture of waste matter, sewage and water as described in paragraph (a) hereof, in excess of an aggregate volume of three million, six hundred fifty thousand (3,650,000) gallons in any twelve-month period, upon reasonable terms and conditions, including a requirement for the payment of compensation to the Sanitary District for the convey-

ing, pumping, treatment and disposal of such excess." Subsection (c) empowers the Sanitary District "*** to pass all necessary ordinances to carry into effect the powers *** conferred ***."

Under the statute, on December 10, 1970, the District enacted an ordinance allowing the discharge of industrial waste into District sewers from any plant coming under the statute which would exceed 3,650,000 gallons annually and providing for the payment of a surcharge for the treatment of the waste by the District. Industrial wastes are defined as: "Any solid, liquid, or gaseous wastes, including cooling water, resulting from any industrial or manufacturing process or from the development, recovery or processing of natural resources." The ordinance declares that an industrial plant is "[a]ny facility which discharges industrial wastes. Each separate industrial plant will be considered and assessed individually even though an owner may operate two or more industrial plants within the Sanitary District." The computation of the surcharge is based upon three factors: the amount of liquid discharged, the "5 day, Biochemical Oxygen Demand," or BOD, of the sewage and the suspended solid content of the sewage. Biochemical Oxygen Demand is defined as "the quantity of dissolved oxygen required for biochemical oxidation of decomposable matter under aerobic conditions in a period of five days at a temperature of 20 degrees centigrade." Suspended solids are: "Solids that either float on the surface or are in suspension in an industrial waste mixture and which are removable by laboratory filtering."

The measurement of the amount and content of the waste subject to the surcharge is made the responsibility of the plant. The ordinance further requires: "In order to provide for accurate sampling and measurement of industrial wastes, each industrial plant shall provide, on each of its industrial waste outlet sewers, a large manhole or sampling chamber ***." And, "[e]ach sampling chamber shall contain a Parshall flume, accurate weir, or similar

device, with a recording and totalizing register for measurement of the liquid quantity; or the metered water supply to the industrial plant may be used as the liquid quantity where it is substantiated that the metered water supply and waste quantities are approximately the same, or where a measurable adjustment can be made in the metered supply to determine the liquid quantity."

On this appeal, the plaintiffs first contend that the sampling chamber and metering device requirements under the ordinance constitute an unlawful taking of their property in violation of due process. After acknowledging that "[u]ncompensated obedience to a regulation enacted for the public safety under the police power of the State is not taking or damaging without just compensation of private property" (*Chicago, Burlington & Quincy R.R. Co. v. City of Chicago, 166 U.S. 226, 41 L.Ed. 979*), the plaintiffs first argue that the surcharge ordinance does not fall within the police power and that its "sole purpose *** is *** to raise money for the Sanitary District ***."

The contention that the surcharge ordinance is unrelated to the exercise of the police power is unimpressive. A system for waste disposal and sewage treatment has long been regarded as necessary for public health (*Hutchinson v. City of Valdosta, 227 U.S. 303, 57 L.Ed. 520, 523; Judge v. Bergman, 258 Ill. 246; People ex rel. Village of South Chicago Heights v. Bergin, 340 Ill. 20, 25*). The plaintiffs, here and in the trial court, have acknowledged that industrial wastes impose a special burden on the District's facilities in comparison with residential wastes, and that the ordinance was designed to compensate the District for the additional cost burden. It is clear that the surcharge ordinance relates to the disposal of waste which obviously poses a potential hazard to public health.

Alternatively, the plaintiffs argue that less costly and equally effective methods for the measurement of industrial waste are available, and that there is a denial of due process through the failure of the ordinance to permit the use of these less costly measuring techniques. The plain-

tiffs found this contention upon a dictum in *Goldblatt v. Town of Hempstead, 369 U.S. 590, 595, 8 L.Ed.2d 130, 134, 82 S.Ct. 987*: "The ordinance in question was passed as a safety measure, and the town is attempting to uphold it on that basis. To evaluate its reasonableness we therefore need to know such things as the nature of the menace against which it will protect, the availability and effectiveness of other less drastic protective steps, and the loss which appellants will suffer from the imposition of the ordinance." Here, the plaintiffs say that the record establishes both the availability of the "less drastic" steps and the allegedly considerable expenditure they and others similarly situated will make. In particular, they tell us that "*** in the case of the companies subject to the ordinance, some 2,000 in all, the capital outlay is approximately $150,000,000 and as much as $200,000,000 if plant shutdowns and business interruptions are considered."

The record shows that the evidentiary support for these claims consists of the testimony of three representatives of companies subject to the ordinance. Thomas J. Walsh, the manager of environmental conservation for the Glidden Durkee Division, Smith-Corona Corporation, testified regarding the costs his company expected to incur for the installation of the required equipment. The witness, who is assigned to a branch of the company in Ohio, said that his company has four plants within the jurisdiction of the sanitary district, which have 28 outlets into the District's sewers. He estimated that to install the necessary manholes and sampling equipment his company would spend an average of $13,000-$15,000 per manhole, or a total of approximately $405,000. He did say, however, that by combining sewer outlets, it should be possible to reduce the installation costs to about $100,000. Walsh also testified that installation of the equipment would in his opinion require the company to shut down part of its operation temporarily.

The witness testified that there were between 5 and 8

manholes already on the premises of these plants, and acknowledged that if his company were able to modify them to meet the requirements of the ordinance, the cost of the installation would be reduced. He did not know if any of the manholes could be so modified. Regarding the basis for his estimates, the witness stated that the $13,000-$15,000 estimates for the cost of a manhole and sampling chamber came from the company's engineering department and were bottomed on an analysis made in Reading, Pennsylvania, in anticipation of the enactment of a surcharge ordinance there. He also testified that the cost of installing a manhole was dependent upon the soil conditions, and admitted that soil conditions in Chicago might very well differ from those in Reading. He did say that he was "*** of course, going to have better estimates before we get very far down the line and start working." The witness acknowledged that most of his company's sewers discharged storm wastes which would not be within the ordinance.

Arthur C. Thomas, the production manager of the Sherwin-Williams Company, testified that his plant has 22 outlets into sewers of the Sanitary District, 16 or 17 of which discharge industrial waste. He said that the number of outlets could probably be reduced to four, and that measuring and sampling devices would have to be installed at each outlet. The company's rough estimate of the cost of combining outlets, he testified, was between $150,000-$200,000. After combining the outlets, the cost of installing the necessary equipment at each outlet would be $19,300. He said this estimate was based on a bid of $16,800 his company had received, plus Sherwin-Williams' own estimated cost of "site preparation." There would be an interruption in the conduct of normal plant operations required to combine the outlets and install the sampling equipment, he said.

The third witness was Clark B. Rose, a vice-president and director of Darling and Company. He testified that his

company has plants within the jurisdiction of the Sanitary District, which have 18 outlets into the District's sewers. Two of these outlets discharge only nonindustrial waste into the District's sewers, and one discharges less than 3,650,000 gallons per year. He estimated that it would cost between $7,000 and $12,000 per manhole to install the required equipment.

The plaintiffs presented no other evidence as to the anticipated cost of installing sampling and measuring equipment, and no evidence regarding scientifically acceptable alternative equipment for measuring industrial waste discharge and its cost. Nor was there any evidence to show the financial positions of the plaintiffs · and how the expenditures for measuring equipment would affect the complaining companies. The record does show that the District considered having the plaintiffs produce their income and other financial records to show the effect the expenditures for equipment would have on the plaintiffs. The District did not persist in seeking to have such records brought into court when it became clear that the plaintiffs desired to base their attack against the requirement for the sampling equipment solely upon what evidence they would offer of the actual cost of the equipment.

We do not judge that the constitutional assurance of due process is violated by the ordinance's requirements of sampling equipment. Where a regulatory ordinance is enacted in furtherance of a purpose embraced within the police power of the State, its constitutional validity depends upon whether the "*** means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals." (*Lawton v. Steele,* 152 U.S. 133, 137, 38 L.Ed. 385; Sproles v. Binford, 286 U.S. 374, 388-389, 76 L.Ed. 1167.) There is a presumption of constitutional validity attaching to an ordinance (*United States v. Carolene Products Co., 304 U.S. 144, 152, 82 L.Ed. 1234*), and the challenging party has the burden of showing the ordinance's lack of reasonableness.

(*Goldblatt v. Town of Hempstead, 369 U.S. 590, 596.*) There was no showing by the plaintiffs that the equipment called for was not reasonably necessary for the measurement of the waste and no showing that similarly efficient but less costly alternative equipment could be used. The testimony of the three witnesses, some of which was hardly definitive, was the only evidence the plaintiffs offered as to the equipment's cost. There was no evidence as to the financial impact the expenditures for equipment would have on the plaintiffs. There was certainly no demonstration that it will be "unduly oppressive."

The plaintiffs invite attention to the provisions of a New York surcharge ordinance considered in *Larsen Baking Co. v. City of New York, 30 App. Div. 2d 400, 292 N.Y.S.2d 145.* The court there held that it was reasonable to measure the content of waste by "industrial averages" and determine the surcharge on an industry-by-industry basis. This case, of course, did not involve the reasonableness of a sampling equipment requirement. Too, we would note that the plaintiffs here did not offer evidence to demonstrate the feasibility of using industrial averages to measure the content of industrial waste to permit them to argue that the sampling requirements in the District's ordinance are unreasonable. The wisdom or unwisdom of a regulatory enactment is for the legislature, and "\*\*\* whether it is the best means to achieve the desired results, and whether the legislative discretion within its prescribed limits should be exercised in a particular manner are matters for the judgment of the legislature, and honest conflict of serious opinion does not suffice to bring them within the range of judicial cognizance." (*Thillens, Inc. v. Morey, 11 Ill.2d 579, 593.*) On this record, the plaintiffs' reference to the "industrial averages" method of measuring the discharging of waste under the New York City ordinance at most may question simply the wisdom of the sampling equipment requirement.

Another argument of the plaintiffs is that the statute

and ordinance "\*\*\* create arbitrary and discriminatory classifications in violation of the equal protection guarantees of the United States and Illinois Constitutions." The first ground for the argument is that the application of the statute and ordinance is arbitrary in that it is limited to industrial concerns, though other commercial businesses contribute significant amounts of waste. The second ground is that the statute and ordinance apply only to industrial concerns which discharge more than 3,650,000 gallons of waste per year.

The claimed support of the first ground came almost entirely from the testimony of Dr. Edward J. Martin, a consulting engineer. This witness had made a study of seven classes of business which he assumed were not industrial or manufacturing plants within the meaning of the ordinance and therefore not covered by its provisions. The seven classes were laundries, bakeries, laundromats, car washes, dairies, poultry processors, and sausage processors. On the basis of the study, these seven classes contributed a sizeable portion of the District's load of nonresidential waste, *i.e.,* 2% of the volume of its load, 32% of BOD, and 12% of the suspended solids in the load. Dr. Martin estimated that the ordinance's failure to include these businesses would deprive the District annually of $1,800,000 in revenue.

In reaching these conclusions the witness testified he had attempted to ascertain businesses not covered by the legislation which contributed more than 3.65 million gallons annually to the District's load, and which had suspended solids and required a substantial amount of BOD. To do this, he determined the number of businesses in the, seven categories examined by use of the Chicago classified telephone directory. Next, he estimated the number of these companies discharging more than 3,650,000 gallons per year into the District's sewers from a print-out furnished by the Water Department of the city of Chicago which listed purchasers of more than 3.65 million

gallons; he allowed a 15% consumptive use factor in computing the amount of purchased water which he estimated was discharged into the District's sewers. To determine the BOD requirement and suspended solid content, he used data from various unspecified technical sources. Finally, he considered the findings from a similar study he had initiated and supervised in Cleveland a few years earlier.

On cross-examination the witness said that he had selected the seven business categories because he was uncertain whether they were included, *i.e.*, whether they were subject to the statute and ordinance. He admitted that, in making his calculations of revenue which the District was being deprived of because the categories were presumably not subject to the legislation, he had not considered certain deductions permitted under the ordinance. Dr. Martin also said that the companies he had selected from the telephone directory included some not falling within the jurisdiction of the District.

Ben Sosewitz, the general superintendent of the District, was called as an adverse witness by the plaintiffs and he testified that there were businesses in the seven categories studied by Dr. Martin which in fact were engaged in manufacturing processes and therefore subject, he considered, to the ordinance's requirements. These categories included wholesale bakeries, dairies, poultry processing and sausage processing. Sosewitz also gave testimony, which was not responded to, as to the reasons for separately classifying waste from industrial or manufacturing processes. He said that in addition to a high suspended solid content and high BOD requirements, industrial or manufacturing wastes also include metals, such as lead, zinc and copper, which interfere with biological treatment processes. These wastes also contain cyanide, which may be toxic to persons treating the sewage and bear other materials "corrosive to the concrete pipe" used to conduct the wastes. The witness testified

that the reason these other constituents of industrial waste were not included in the ordinance as factors in determining the surcharge was the prohibitive cost of measuring them.

We consider that the plaintiffs failed to support adequately the contention that there is a denial of equal protection because the application of the surcharge ordinance is limited to waste produced from industrial and manufacturing processes. The plaintiffs presented testimony that a portion, which was a considerably lesser portion, of the District's load came from commercial nonindustrial wastes, but the conclusions to be drawn from the testimony of Dr. Martin were uncertain. They were uncertain because it appears there were businesses in most of the categories in his study which were said to be and may be in fact under the ordinance. Dr. Martin said he was uncertain whether the categories were covered, but his conclusions were bottomed on the assumption they were exempted. The general superintendent of the District gave reasons for the separate classification of industrial wastes. His testimony was that this waste, in addition to having high suspended solid content and BOD requirements, contains harmful and toxic materials which present special processing problems. The legislature is not bound, when confronted with a situation calling for regulation, to make the unrealistic choice of establishing total and exhaustive regulation or none at all. This familiar principle was expressed in *Thillens v. Morey, 11 Ill.2d 579, 595,* where it was said: "*** the legislature is not bound to extend its regulation to all cases which it might possibly reach. It may confine its restrictions to those classes where the need is deemed to be the clearest." See also *Martin v. Struthers, 319 U.S. 141, 153-154, 87 L.Ed. 1313, 1322.*

We consider that here the legislature could properly restrict the ordinance's reach to industrial wastes—to "where the need is deemed to be the clearest."

The same reasoning rejects the plaintiffs' contention

that limiting the application of the statute and ordinance to concerns discharging more than 3,650,000 gallons annually violated the equal-protection requirements of the Illinois and United States constitutions.

The plaintiffs do not contend that the point where regulation begins should be higher than 3,650,000 gallons per year of discharge. They say that the failure to regulate and charge every concern which discharges industrial waste, in whatever amount, is violative of equal protection of the law. But, as has been observed, the legislature is not obliged to choose between regulation of all or none. We cannot regard as unreasonable *per se* a regulation applying only to those whose activities create a substantial burden or load on the facilities of the District. In addition, the testimony of the superintendent of the District was that the cost of treating industrial waste was not directly proportionate to the amount of waste treated. Rather the greater amount of this waste to be treated, the higher was the rate. It was not unreasonable to determine that the need for a surcharge was clearest in the case of concerns discharging large quantities into the District's sewers.

The judgment of the circuit court of Cook County is affirmed.

*Judgment affirmed.*