414 A.2d 37

NATIONAL WOOD PRESERVERS, INC., Clifford Rogers and Virginia Rogers, Appellants,

v.

COMMONWEALTH of Pennsylvania DEPARTMENT OF ENVIRONMENTAL RESOURCES.

COMMONWEALTH of Pennsylvania, DEPARTMENT OF ENVIRONMENTAL RESOURCES, Appellant,

v.

SHELL OIL COMPANY, Philadelphia Chewing Gum Company.

Supreme Court of Pennsylvania.

Argued Dec. 10, 1979.

Decided April 24, 1980.

222

Stephen R. Bolden, Daniel B. Michie, Jr., Philadelphia, for appellant in No. 66.

J. Stoke Adams, III, Philadelphia, Kenneth A. Clouse, Media, Leonard Dubin, Philadelphia, James S. Kilpatrick, Jr., Ardmore, Dennis M. Coyne, Asst. Atty. Gen., and Alan V. Vaskas, Chester Springs, for appellees in No. 66.

James S. Kilpatrick, Jr., Ardmore, for appellant in No. 67.

J. Stoke Adams, III, Philadelphia, Kenneth A. Clouse, Media, Leonard Dubin, Stephen R. Bolden, Philadelphia, Dennis M. Coyne, Asst. Atty. Gen., and Alan V. Vaskas, Chester Springs, for appellees in No. 67.

Dennis M. Coyne, Asst. Atty. Gen., for appellant in No. 68.

J. Stoke Adams, III, Philadelphia, Kenneth A. Clouse, Media, Leonard Dubin, Stephen R. Bolden, Philadelphia, James S. Kilpatrick, Jr., Ardmore, and Alan V. Vaskas, Chester Springs, for appellees in No. 68.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, LARSEN and FLAHERTY, JJ.

## OPINION OF THE COURT

ROBERTS, Justice.

This is a case of first impression. At issue is the construction and constitutionality of Section 316 of The Clean Streams Law, Act of July 31, 1970, P.L. 653, § 12, amending 35 P.S. § 691.316. Section 316 provides in relevant part:

"Whenever the [Department of Environmental Resources] finds that pollution or a danger of pollution is

resulting from a condition which exists on land in the Commonwealth the [Department] may order the landowner or occupier to correct the condition in a manner satisfactory to the [Department] . . . ." [1]

The principal questions presented by this appeal are whether Section 316 authorizes the Department of Environmental Resources to remedy water pollution resulting from conditions other than mine drainage, and whether Section 316 is a constitutional exercise of the Legislature's police power. Like the Environmental Hearing Board and the Commonwealth Court, we conclude that both questions must be answered in the affirmative. Accordingly, we affirm the order of the Commonwealth Court affirming the order of the Environmental Hearing Board.

## I

The dispute in this case concerns a parcel of land in Delaware County owned by appellants Clifford and Virginia Rogers and leased in part by appellant National Wood Preservers, Inc.[2] The Rogers have owned this parcel since 1942. In 1947 they leased it to Samuel T. Jacoby and C. David Jacobs, who then assigned the lease to National Wood Preservers, Inc. This company, all of whose stock was owned by Jacoby, conducted a wood preservative business on the parcel between 1947 and 1963. National Wood Preservers, Inc. used a chemical called pentachlorophenol, "a toxic substance . . . lethal to acquatic organisms in certain

1. The powers of the Sanitary Water Board were transferred to the Department of Environmental Resources by the Act of December 3, 1970, P.L. 834, § 30(a), 71 P.S. § 510–1(22). The Legislature has invested the Department of Environmental Resources with broad responsibilities and powers in regulating the environment. See 71 P.S. § 510–1; see generally James O. Freedman, Crisis & Legitimacy 4–5 (1978).

2. The Rogers' parcel is described as:
"ALL that certain lot or piece of ground with buildings thereon erected situate in Oakmont, Delaware County, Pennsylvania, on the northwest side of Eagle Road, beginning at a point approximately 150 feet northeast of Lawrence Road, containing 366 feet on Eagle Road, 415 feet on the north line, 300 feet on the west line and 200 feet on the south line."

concentrations."[3] In the course of its operations, National Wood Preservers, Inc. disposed of waste liquids containing pentachlorophenol, by discharging them into a well which drained into the groundwaters running beneath the premises. In 1963 Jacoby sold his shares in National Wood Preservers, Inc. to the Goldsteins.[4] The Goldsteins have continued to operate National Wood Preservers, Inc. as a wood preservative business on the land in question.

On June 12, 1972, in response to numerous complaints, the Department of Environmental Resources (DER) initiated its investigation of an oily substance found in Naylors Run, a stream flowing near appellants' tract. On the basis of this investigation, which included the collection and analysis of numerous water samples from the area around Naylors Run, DER determined that the groundwaters of that tract contain a polluting substance of pentachlorophenol and fuel oil. In 1973, pursuant to Section 316 of The Clean Streams Law, DER issued orders to appellants Rogers and appellant National Wood Preservers, Inc. to abate this harmful condition.[5]

Appellants appealed to the Environmental Hearing Board. The Board consolidated the appeals and conducted extensive hearings over a thirteen day period. The Board found inter alia that the pentachlorophenol, which was mixed with fuel oil in the waters of the Commonwealth, constitutes pollution within the meaning of Section 316, see 35 P.S. § 691.1, and that the major amount of this substance appears to be pooled under the surface of the property owned by Rogers and leased in part by National Wood Preservers, Inc. The

**3.** Adjudication of Environmental Hearing Board, R. 138a–177a, at R. 160a.

**4.** The July 30, 1963 stock purchase agreement included Jacoby's warranty that all pollution problems of National Wood Preservers, Inc. had been cured. On September 17, 1963, Jacoby was arrested by the Pennsylvania State Police for polluting. By agreement dated December 31, 1964, the Goldsteins released Jacoby from his warranty in partial consideration of Jacoby's $35,000 reduction of the stock purchase price.

**5.** The parties stipulate that the sole authority for DER's orders is Section 316 of The Clean Streams Law.

Board therefore ordered appellants, under the supervision of DER, first to conduct drilling and water sampling to determine the precise amount and dispersion of the pollutant, and then to remove it.[6] The Board also found that the program for removal of the pollutant outlined in its findings and order was feasible.[7] Appellants filed timely appeals to the Commonwealth Court. That court consolidated the appeals and unanimously affirmed the orders of the Environmental Hearing Board as to appellants. This Court granted allowance of appeal, also consolidating the appeals.[8]

## II

Appellants' first contention is that the Legislature, in enacting Section 316, intended to permit the Department of

6. The Board ordered in the alternative that the Department conduct the sampling and removal itself, or so order another person or agency. DER could charge the costs incurred to appellants to the extent that corrective actions were taken on their land. Additionally, the Board retained jurisdiction.

7. The Environmental Hearing Board noted that the issue of ultimate allocation of liability was not before it. Nor is that issue before this Court, and thus we need not express any view on it.

8. Two other actions consolidated previously with the present actions must be mentioned here. When DER issued corrective orders to appellants in 1973, it also issued corrective orders to Philadelphia Chewing Gum Corp. (Gum) and Shell Oil Co. (Shell). Gum owned a parcel of land adjacent to appellants' land, where it manufactured chewing gum products. Shell operated a gasoline station on land leased from the Rogers. Shell's parcel had been leased by National Wood Preservers, Inc. until 1967, when National Wood Preservers, Inc. released this portion of its leasehold to Rogers who rented it to Shell. Neither Gum nor Shell has ever discharged industrial waste into the waters of the Commonwealth. When Gum and Shell appealed from DER's orders, the Environmental Hearing Board consolidated their appeals with appellants'. The Board found that the polluting substance beneath appellants' land was also beneath the land of Gum and Shell, and therefore ordered Gum and Shell also to take corrective action. The separate appeals of Gum and Shell from this order were consolidated by the Commonwealth Court with those of appellants. That court sustained the appeals of Gum and Shell on the ground that Section 316 was inapplicable to them. DER failed to file timely appeals from this portion of the Commonwealth Court order, and thus this Court now dismisses the Department's petitions for allowance of appeal as improvidently granted.

Environmental Resources to order a landowner or occupier to correct a condition which results in pollution or the danger of pollution only if the condition were caused by mining operations. Like the Environmental Hearing Board and the Commonwealth Court, we reject this contention.

As the previously quoted portion of Section 316 makes evident, the Legislature has clearly and unambiguously authorized DER to require the correction of water pollution-causing conditions without regard to the source of the pollution. Indeed, the caption of Section 316, "Responsibilities of landowners and land occupiers," suggests the section's breadth. See 1 Pa.C.S.A. § 1924 ("The headings prefixed to . . . sections and other divisions of a statute shall not be considered to control but may be used to aid in the construction thereof."); compare 35 P.S. § 691.2 B. The Legislature has instructed that "[w]hen the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa.C.S.A. § 1921(b). In accord with this legislative mandate, this Court must conclude that Section 316 authorizes DER's actions here.

Our reading of Section 316 is indeed entirely in harmony with, and fully in accord with, the Legislature's objective, see 1 Pa.C.S.A. § 1921(c), as expressly set forth in Section 4 of the Act, 35 P.S. § 691.4:

> "(1) Clean, unpolluted streams are absolutely essential if Pennsylvania is to attract new manufacturing industries and to develop Pennsylvania's full share of the tourist industry;
>
> (2) Clean, unpolluted water is absolutely essential if Pennsylvanians are to have adequate out of door recreational facilities in the decades ahead;
>
> (3) It is the objective of the Clean Streams Law not only to prevent further pollution of the waters of the Commonwealth, but also to reclaim and restore to a clean, unpolluted condition every stream in Pennsylvania that is presently polluted;

(4) The prevention and elimination of water pollution is recognized as being directly related to the economic future of the Commonwealth; and

(5) The achievement of the objective herein set forth requires a comprehensive program of watershed management and control."

From this "Declaration of Policy," enacted in 1970 along with the portion of Section 316 relevant here, it is clear that the Legislature seeks to eliminate all water pollution, not only water pollution emanating from mines, and to "reclaim and restore" every polluted stream. Thus any contrary or narrower reading of Section 316 would fundamentally undermine the efforts of DER to achieve these legislative objectives, as well as frustrate the Legislature's fulfillment of its obligation under Article I, section 27 of the Pennsylvania Constitution:

"The people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment. Pennsylvania's public natural resources are the common property of all people, including generations yet to come. As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people."

Nevertheless, appellants claim that Section 316 should be restricted. They cite provisions of The Clean Streams Law enacted in 1965, see Act of August 23, 1965, P.L. 372, five years before enactment of the relevant portion of Section 316, enacted in 1970. It is claimed that these provisions, including Section 4 setting forth the purpose of the Act, demonstrate a legislative concern for mine drainage pollution only. Appellants also cite another provision of Section 316, enacted in 1965 and inapposite here, which permits DER to "order such owner or occupier to allow a mine operator or other person or agency of the Commonwealth access to the land to take such action." Additionally, they point to Section 316's proximity to Section 315, enacted in 1965, a section concerned with mines.

Our consideration of the history of The Clean Streams Law compels us to reject appellants' limited view of the Legislature's purpose in enacting the relevant portion of Section 316. The 1970 amendments to The Clean Streams Law remove any doubt as to the breadth of the statute's purpose. Those amendments eliminate from the very 1965 provisions concerning the Act's purpose, upon which appellants rely, any mention of mine-produced pollution.

In any case, even the 1965 provisions to which appellants refer lend no support to their contention. There is no doubt, of course, that until enactment of the 1965 amendments to The Clean Streams Law, the Legislature had not yet authorized a state agency to remedy the growing pollution problem posed by mine drainage.[9] See generally *Commonwealth v. Barnes & Tucker*, 455 Pa. 392, 395–401, 319 A.2d 871, 873–76 (1974) (*Barnes & Tucker I*); *Commonwealth v. Harmar Coal Co.*, 452 Pa. 77, 83–86, 306 A.2d 308, 312–13 (1973). The 1965 amendments were enacted in part to provide an administrative remedy for this problem.

It is equally clear, however, that the Legislature also enacted the 1965 amendments to combat water pollution generally. The dual purpose of these amendments becomes clear upon reviewing the "Findings & Declarations of Policy" enacted as part of the 1965 amendments, § 2. Half the findings concerned the problem posed by mine drainage, and the other half concerned the problems of water pollution generally. More important, the declarations of policy expressly stated:

**9.** Prior to the enactment of The Clean Streams Law in 1937, see Act of June 22, 1937, P.L. 1987, § 1 et seq., acid mine drainage had been excluded from this Commonwealth's water pollution control. See Purity of Waters Act, April 22, 1905, P.L. 260, § 4; and the Act of June 14, 1923, P.L. 793, § 1. As enacted in 1937, Section 310 of The Clean Streams Law exempted acid mine drainage "until such time as . . . practical means for the removal of the polluting properties of such drainage shall become known." When The Clean Streams Law was amended in 1945, Act of May 8, 1945, P.L. 435, Section 310 was changed to require the Sanitary Water Board to protect certain clean waters, though it permitted pollution of already polluted streams.

"It is the objective of the Clean Streams Law not only to prevent further pollution of the waters of the Commonwealth, but also to reclaim and restore to a clean, unpolluted condition every stream in Pennsylvania that is presently polluted . . . ."

This statement of purpose of The Clean Streams Law, never before expressly articulated by the Legislature, did not distinguish between sources of water pollution. Rather, all water pollution was proscribed. Thus even appellants' own argument, turning as it does on the Act as it existed before enactment of the relevant portion of Section 316, must fail.

### III

Appellants' second contention is that Section 316 of The Clean Streams Law is an impermissible exercise of the police power, in violation of the Fourteenth Amendment of the United States Constitution and Article I, section 10 of the Pennsylvania Constitution. Again, we agree with the conclusion of the Environmental Hearing Board and the Commonwealth Court to the contrary.

■ The "police power" is one of the "most essential powers of government . . . ." *Hadacheck v. Sebastian*, 239 U.S. 394, 410, 36 S.Ct. 143, 145, 60 L.Ed. 348 (1915). It has been variously defined as the power "to promote the public health, morals or safety and the general well-being of the community," *Commonwealth v. Harmar Coal Co.*, supra, 452 Pa. at 92, 306 A.2d at 316; see *DePaul v. Kauffman*, 441 Pa. 386, 393, 272 A.2d 500, 504 (1971), or as "the inherent power of a body politic to enact and enforce laws for the promotion of the general welfare," *Commonwealth v. Barnes & Tucker*, 472 Pa. 115, 123, 371 A.2d 461, 465 (1977) (*Barnes & Tucker II*), or as a power extending to "all the great public needs," *Day-Brite Lighting, Inc. v. Missouri*, 342 U.S. 421, 424, 72 S.Ct. 405, 407, 96 L.Ed. 469 (1952).[10] The

10. In one of this Court's earliest discussions of the police power, we observed that *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 6 L.Ed. 23 (1824)

police power is fundamental because it enables "civil society" to respond in an appropriate and effective fashion to changing political, economic, and social circumstances, and thus to maintain its vitality and order. See, e. g., *Mugler v. Kansas,* 123 U.S. 623, 668, 8 S.Ct. 273, 301, 31 L.Ed. 205 (1887). "The police power of the state [must therefore be] . . . as comprehensive as the demands of society require under the circumstances." *Barnes & Tucker II,* 472 Pa. at 126, 371 A.2d at 467. Of necessity, then, the police power is a broad and flexible power. See, e. g., *Berman v. Parker,* 348 U.S. 26, 32, 75 S.Ct. 98, 102, 99 L.Ed. 27 (1954); *Euclid v. Ambler Realty Co.,* 272 U.S. 365, 386–90, 47 S.Ct. 114, 118–19, 71 L.Ed. 303 (1926). Indeed, it is the state's least limitable power. See *Hadacheck v. Sebastian,* supra at 410, 36 S.Ct. at 145.

■ A state power as broad as the police power inevitably gives rise to tensions between the state and holders of property. Although the police power "may, indeed, seem harsh in its exercise, [and] usually is on some individual, . . . the imperative necessity for its existence precludes any limitation upon it when not exerted arbitrarily." *Hadacheck v. Sebastian,* supra at 410, 36 S.Ct. at 145; see *Miller v. Board of Public Works,* 195 Cal. 477, 484, 234 P. 381, 383

> "concedes to the state an 'immense mass of legislation which embraces everything within the territory of a state not surrendered to the General Government, all which can be most advantageously exercised by the states themselves. Inspection laws, quarantine laws, health laws of every description, as well as laws regulating the internal commerce of a state, and those which respect turnpike, roads, ferries, &c., are component parts of this mass.' These and others not enumerated constitute police powers—such as are exercised in the passage of laws to promote the peace, safety, good order, health and interests of the state, and are protected by the 9th and 10th articles of the amendments to the Constitution of the United States. The powers reserved to the states (says the 45th number of The Federalist) will extend to all the objects which in the ordinary course of affairs concern the lives, liberties and property of the people, and the internal order, improvement and prosperity of the state."
>
> *Craig v. Kline,* 65 Pa. 399, 408 (1870). See also *Powell v. Commonwealth,* 114 Pa. 265, 7 A. 913 (1887), *aff'd sub nom. Powell v. Pennsylvania,* 127 U.S. 678, 8 S.Ct. 992, 32 L.Ed. 253 (1888); *Commonwealth v. Plymouth Coal Co.,* 232 Pa. 141, 81 A. 148 (1911).

(1925). Therefore as long as the Legislature exercises that power in a reasonable and nonarbitrary manner, the judiciary will not invalidate the enactment.[11] See *City of New Orleans v. Dukes*, 427 U.S. 297, 303–04, 96 S.Ct. 2513, 2516–17, 49 L.Ed.2d 511 (1957); *Nebbia v. New York*, 291 U.S. 502, 525, 54 S.Ct. 505, 510–11, 78 L.Ed. 940 (1934); *Tosto v. Pennsylvania Nursing Home Loan Agency*, 460 Pa. 1, 9, 331 A.2d 198, 201–02 (1975); accord *Sproles v. Binford*, 286 U.S. 374, 388, 52 S.Ct. 581, 585, 76 L.Ed. 1167 (1932) (even when the reasonableness of legislation is "fairly debatable," the judiciary must refrain from disturbing it).

Review of the case law reveals that the police power has been constitutionally exercised in many ways over innumerable types of property. See generally *Penn Central Transportation Co. v. New York*, 438 U.S. 104, 123–28, 98 S.Ct. 2646, 2658–62, 57 L.Ed.2d 631 (1978). Of relevance here, legislation protecting state water resources has been held to be within the scope of the police power. See, e. g., *Hudson Water Co. v. McCarter*, 209 U.S. 349, 28 S.Ct. 529, 52 L.Ed. 828 (1908); *Barnes & Tucker Co. v. Pennsylvania*, 434 U.S. 807, 98 S.Ct. 38, 54 L.Ed.2d 65 (1977), *dismissing appeal for want of a substantial federal question, Barnes & Tucker II*, supra; *Harmar Coal Co. v. Pennsylvania*, 415 U.S. 903, 94 S.Ct. 1395, 39 L.Ed.2d 460 (1974), *dismissing appeal for want of a substantial federal question, Commonwealth v. Harmar Coal Co.*, supra; *Commonwealth v. Emmers*, 221 Pa. 298, 70

11. As Justice Frankfurter in *American Federation of Labor v. American Sash and Door Co.*, 335 U.S. 538, 553, 69 S.Ct. 258, 265, 93 L.Ed. 222 (1949) (concurring opinion) observed:

"Even where the social undesirability of a law may be convincingly urged, invalidation of the law by a court debilitates popular democratic government. Most laws dealing with economic and social problems are matters of trial and error. That which before trial appears to be demonstrably bad may belie prophesy in actual operation. It may not prove good, but it may prove innocuous. But even if a law is found wanting on trial, it is better that its defects should be demonstrated and removed than that the law should be aborted by judicial fiat. Such an assertion of judicial power deflects responsibility from those on whom in a democratic society it ultimately rests—the people."

A. 762 (1908).[12] Moreover, the police power has been used to impose new costs on property owners. See, e. g., *Atchison, T. & S. F. Ry. Co. v. Public Utilities Comm'n*, 346 U.S. 346, 74 S.Ct. 92, 98 L.Ed. 51 (1953); *Queenside Hills Realty Co. v. Saxl*, 328 U.S. 80, 66 S.Ct. 850, 90 L.Ed. 1096 (1946); *Erie R. Co. v. Board of Public Utility Comm'n*, 254 U.S. 394, 41 S.Ct. 169, 65 L.Ed. 322 (1921).

In *Lawton v. Steele*, 152 U.S. 133, 14 S.Ct. 499, 38 L.Ed. 385 (1894), the Supreme Court articulated the standard to be used by courts in determining the validity under the United States Constitution of a state's exercise of its police power.

> "To justify the State in thus interposing its authority in behalf of the public, it must appear,—first, that the interests of the public . . . require such interference; and, second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals."

152 U.S. at 137, 14 S.Ct. at 501. This Court has adopted this standard in our assessment of regulatory legislation under the Pennsylvania Constitution. See *Commonwealth v. Harmar Coal Co.*, supra, 452 Pa. at 93, 306 A.2d at 317; *Barnes & Tucker I*, supra, 455 Pa. at 418, 319 A.2d at 885; *Barnes & Tucker II*, supra, 472 Pa. at 123, 371 A.2d at 465.

 It is fundamental to our jurisprudence that enactments of the Legislature are clothed with a presumption of constitutional validity, and that appellants, by claiming that an act is unconstitutional, carry a heavy burden of proof. See, e. g., *United States v. Vuitch*, 402 U.S. 62, 70, 91 S.Ct. 1294, 1298, 28 L.Ed.2d 601 (1971); *In re William L.*, 477 Pa. 322, 329, 383 A.2d 1228, 1231 (1978); *Tosto v. Pennsylvania Nursing Home Loan Agency*, supra, 460 Pa. at 16, 331 A.2d at 205, quoting *Daly v. Hemphill*, 411 Pa. 263, 271, 191 A.2d 835, 840 (1963) ("Courts may not declare a statute unconstitutional 'unless it *clearly, palpably* and *plainly* violates the Constitution.' ").

---

12. See generally *Hicks v. Miranda*, 422 U.S. 332, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975) (dismissal for want of a substantial federal question is a decision on the merits).

■ Appellants do not contend that Section 316 fails to satisfy *Lawton's* first prong. As stated above, Article I, section 27 of the Pennsylvania Constitution imposes a duty upon the Commonwealth to protect our environment. Indeed, maintenance of the environment is a fundamental objective of state power. As Justice Holmes wrote:

> "[T]he state has an interest independent of and behind the titles of its citizens, in all the earth and air within its domain. . . . It is a fair and reasonable demand on the part of a sovereign that the air over its territory should not be polluted . . . , that the forests on its mountains, be they better or worse, and whatever domestic destruction they have suffered, should not be further destroyed or threatened . . . , that the crops and orchards on its hills should not be endangered . . .."

*Georgia v. Tennessee Copper Co.*, 206 U.S. 230, 237–38, 27 S.Ct. 618, 619, 51 L.Ed. 1038 (1907). The Legislature has long regulated the quality of the waters in the Commonwealth. See Purity of Waters Act, note 9, supra; cf. *Commonwealth v. Locust Point Quarries, Inc.*, 483 Pa. 350, 358, 396 A.2d 1205, 1209 (1979) ("In sum, protection of air resources is a matter of highest priority in the Commonwealth."). In addition, other state legislatures, as well as Congress, have made extensive efforts to remove the pollution from our nation's waters.[13]

13. See, e. g., *Bridgeport Hydraulic Co. v. Council on Water Co. Lands*, 439 U.S. 999, 99 S.Ct. 606, 58 L.Ed.2d 674 (1978), *affirming mem.* 453 F.Supp. 942 (D.Conn.1977) (holds that Connecticut Moratorium Act, which restricts sale of surplus lands to limit watershed pollution, is reasonable exercise of police power); *United States v. Ashland Oil*, 504 F.2d 1317 (6th Cir. 1974) (discusses the many dangers of water pollution which justify congressional enactment of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251–1376); *Chicago Allis v. Sanitary District*, 52 Ill.2d 320, 288 N.E.2d 436 (1972) (holds that ordinance surcharging industrial plants' waste discharge and requiring all plants to install devices to measure discharge is valid exercise of police power); *Candlestick v. San Francisco*, 11 Cal.App.3d 557, 89 Cal.Rptr. 897 (1970) (California's McAteer-Petris Act authorizing Bay Conservation and Development Commission to regulate deposits of fill in Bay held to be constitutional exercise of police power). See generally ALI Model Land Development Code § 7–201 (Official Draft, 1975).

We are also convinced that Section 316 and the orders promulgated thereunder satisfy the first part of *Lawton's* "means" prong. Section 316's authorization of DER to order a landowner or occupier to correct conditions on his land causing pollution or a danger of pollution is "reasonably necessary" for eliminating water pollution. Certainly the owner or occupier of land is well situated to remove harmful conditions from his land. Likewise, the Environmental Hearing Board's abatement orders are "reasonably necessary" in light of the Board's well supported findings that pollution exists under the land of appellants, and that removal of the pollutant is feasible.[14]

■ Appellants focus their constitutional attack upon *Lawton's* third requirement that the means are not to be "unduly oppressive upon individuals." Though it is impossible to define this requirement precisely, see *Goldblatt v. Hempstead*, 369 U.S. 590, 594, 82 S.Ct. 987, 990, 8 L.Ed.2d 130 (1962); see generally J. L. Sax, *Takings and the Police Power*, 74 Yale L.J. 36 (1964), a recent opinion of the United States Supreme Court, *Penn Central Transportation Co. v. New York*, supra, identifies two general factors of significance in the judicial determination of whether governmental action is unduly oppressive. The first consideration is the economic impact of the regulation on the property holder. Id. at 124, 98 S.Ct. at 2659. Specifically, it is relevant to compare property values before and after the regulation, though such a consideration is by no means conclusive. Compare *Euclid v. Ambler Realty Co.*, supra (regulation reducing property value by 75% held constitutional) and *Hadacheck v. Sebastian*, supra (regulation reducing property value by 87½% held constitutional) with *Pennsylvania Coal*

14. We find that the record amply supports the Environmental Hearing Board's findings of fact, and therefore will not disturb them. See *Blumenschein v. Housing Authority*, 379 Pa. 566, 573, 109 A.2d 331, 335 (1954) (in absence of arbitrary exercise of agency's duties, "judicial discretion may not be substituted for administrative discretion"); *American Power Co. v. S. E. C.*, 329 U.S. 90, 112, 67 S.Ct. 133, 146, 91 L.Ed. 103 (1946) (The "relation of remedy to policy is peculiarly a matter of administrative competence.") (quotation omitted).

*Co. v. Mahon*, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922) (regulation rendering property worthless held unconstitutional).

■ The second factor identified in *Penn Central* is the character of the governmental action. 438 U.S. at 124, 98 S.Ct. at 2659. The greater the extent to which governmental interference with property can be characterized as a physical intrusion, the more likely it is that such interference will be considered an unreasonable exercise of police power. Compare *Goldblatt v. Hempstead*, supra (regulation prohibiting property's most beneficial use is valid exercise of police power) and *Euclid v. Ambler Realty Co.*, supra (regulation prohibiting property's most profitable use held valid exercise of police power) with *Causby v. United States*, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946) (U.S. airplanes taking off and landing over property held to be a taking since U.S. is in effect "using" that property).

Appellants do not argue that Section 316 is "unduly oppressive" because of its economic impact or its interference with their use of the property. Rather, appellants advance the somewhat unique argument that Section 316 is unduly oppressive because it imposes liability upon appellants solely on the basis of their ownership or occupancy of the land in question.[15] It is unconstitutional, argue appellants, for DER to issue a corrective order to a landowner or occupier absent a showing of the party's responsibility for causing the polluting condition.[16]

**15.** Appellants cite in support of this argument *Robinson v. California*, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962). Whatever the merits of their argument, appellants' reliance on *Robinson* is misplaced. The Supreme Court declared in that case that a statute criminalizing the "status" of narcotics addiction was unconstitutional. The instant case does not involve a criminal statute, but rather involves the exercise of police power in a civil regulation, where there is no requirement of *actus reus* and *mens rea*.

**16.** Appellants assume that they have acted without "fault" and have not "caused" the pollution. In light of our disposition of this case, we need not consider this assumption.

We disagree. First it is absolutely clear that the corrective orders here are based on much more than mere ownership or occupancy. As discussed above, they are based upon legislation designed to eliminate all water pollution, and the Environmental Hearing Board's findings that a substance, determined to be pollution, resides under appellant's land and can feasibly be removed. There is thus a reasonable and concrete basis for the corrective orders here.

■ It is also clear that the validity of an exercise of police power over land depends little upon the owner or occupier's responsibility for causing the condition giving rise to the regulation.[17] For example, in *Penn Central Transportation Co. v. New York,* supra, the New York City Landmarks Preservation Commission designated Grand Central Station a "landmark" as part of the City's comprehensive program to preserve historic landmarks and districts. Such a designation meant that the terminal owner was required to maintain the exterior architecture of the terminal in good repair, that the terminal facade could not be altered without approval of the Commission, and that the terminal's economic potential could not be fully developed by the construction of an office building atop the terminal. The Supreme Court held the City's landmark designation to be constitutional. It

17. We note that the imposition of vicarious liability is not an uncommon means of eliminating water pollution. See *Portland Pipe Line v. Environmental Improvement Commission,* 414 U.S. 1035, 94 S.Ct. 532, 38 L.Ed.2d 326, *dismissing appeal for want of a substantial federal question,* 307 A.2d 1 (Me.1973) (state statute imposing vicarious liability upon oil terminal operators for oil spills caused by independent carriers who were destined for the operators' terminals, but over whom the operators had no control, held to be valid exercise of police power); *United States v. Marathon Pipe Line Co.,* 589 F.2d 1305 (7th Cir. 1978) (Coast Guard constitutionally imposed liability under Federal Water Pollution Control Act § 311(b)(6) upon pipeline owner for pipeline rupture and oil spill caused by third party); *United States v. Tex-Tow, Inc.,* 589 F.2d 1310 (7th Cir. 1978) (imposition of civil penalty upon barge owner under Federal Water Pollution Control Act § 311(b)(6) for oil spill resulting from puncture of barge hull caused by third party held valid); *Gulf Oil Corp. v. United States,* 573 F.2d 1303 (3rd Cir. 1978), *affirming mem. United States v. Atlantic Richfield,* 429 F.Supp. 830 (E.D.Pa.1977) (Section 311(b)(6) of Federal Water Pollution Control Act constitutionally imposes civil penalty upon oil spiller without regard to fault.

is clear from the facts in *Penn Central* that the terminal owner was in no way responsible for causing the terminal's landmark status: the owner did not "cause" the condition, nor can he be viewed as being "at fault." The Supreme Court disregarded the owner's lack of responsibility, however, and found the City's action constitutional.

 *Miller v. Schoene*, 276 U.S. 272, 48 S.Ct. 246, 72 L.Ed. 568 (1928) also illustrates that a property holder's responsibility for the condition to be regulated is not an important factor in assessing the validity of the regulation. In that case a state agency pursuant to statute ordered property owners to cut down a large number of ornamental red cedar trees growing on their property because the trees produced cedar rust fatal to apple trees cultivated on adjacent land. Though the statute permitted the owners to use the felled trees and recover the costs of removing the trees, it did not provide compensation for the value of the trees or the diminished value of the property. The Court nonetheless found the statute constitutional, holding that a state could properly make "a choice between the preservation of one class of property and that of the other." Id. at 279, 48 S.Ct. at 247. Since the apple industry was important to the state, the Court concluded that the state had not acted unconstitutionally "by deciding upon the destruction of one class of property [without compensation] in order to save another, which, in the judgment of the legislature, is of greater value to the public." Id. The facts in *Miller* suggest that the property holders could not have caused the infection of their red cedar trees. The holding and discussion in *Miller* reflect the Court's conviction that such a consideration is of little import.[18] See also *Goldblatt v.*

18. It is appropriate that a property holder's responsibility has little significance in determining the validity of the state regulation. In criminal law, of course, inquiry into a defendant's "culpability" is at the core of guilt determination and punishment. In the field of tort law, the notion of "fault" is not an inappropriate limitation on liability because, among other reasons, the beneficiary of tort compensation, like the tortfeasor, is a private party. The notion of fault is least functional, however, when balancing the interests of a property holder against the interests of a state in the exercise of its police

*Hempstead,* supra; *Euclid v. Ambler Realty Co.,* supra; *Hadacheck v. Sebastian,* supra. In light of *Penn Central, Miller,* and the other cases cited, appellants have failed to persuade us that the Commonwealth has unconstitutionally exercised its police power.[19]

Orders of the Commonwealth Court at Nos. 66 and 67 January Term, 1979 are affirmed. Commonwealth's appeals from Commonwealth Court's orders at No. 68 January Term, 1979 are dismissed.

NIX, J., did not participate in the consideration or decision of this case.

FLAHERTY, J., filed a concurring opinion.

FLAHERTY, Justice, concurring.

At issue is the constitutionality of a portion of Section 316 of The Clean Streams Law, Act of July 31, 1970, P.L. 653, § 12, amending 35 P.S. § 691.316, which provides:

"Whenever the [Department of Environmental Resources] finds that pollution or a danger of pollution is resulting from a condition which exists on land in the Commonwealth the [Department] may order the landowner or occupier to correct the condition in a manner satisfactory to the [Department] . . . ."

A reading of the majority opinion might lead to the belief that we adopt the strict liability construction of Section 316 which would compel the expenditure of financial sums by an owner or occupancy of land *based on no other factor* but the

power, because the beneficiary is not an individual but the community. As this Court stated in an analogous setting: "The absence of facts supporting concepts of negligence, foreseeability or unlawful conduct is not in the least fatal to a finding of the existence of a common law public nuisance." *Barnes & Tucker I,* supra, 455 Pa. at 414, 319 A.2d at 883.

19. We note our agreement with the Commonwealth Court's rejection of appellants' additional claims that the feasibility of abatement was not sufficiently proven, that the abatement orders are unconstitutional ex post facto laws, that DER's enforcement of Section 316 violates the Equal Protection Clause, and that a provision of Section 316 not in issue here violates the Equal Protection Clause.

ownership or occupancy of the land. The learned late Judge Bowman, writing the opinion for the court below well set forth the law regarding this issue, and I quote that portion of the opinion:

"The police power of this Commonwealth may not be used to require a landowner 'to abate a public nuisance existing on his land where such ownership is unrelated to the forces or conditions resulting in a public nuisance.' *Commonwealth v. Barnes & Tucker Co.*, 23 Pa.Cmwlth. 496, 509, 353 A.2d 471, 478 (1976), aff'd 472 Pa. 115, 371 A.2d 461 (1977); *Commonwealth v. Wyeth Laboratories*, 12 Pa.Cmwlth. 227, 315 A.2d 648 (1974). The police power of the Commonwealth may be brought to bear upon a landowner, however, at least under the theory of common law public nuisance, notwithstanding '[t]he absence of facts supporting concepts of negligence, foreseeability or unlawful conduct.' *Barnes & Tucker I*, supra, 455 Pa. at 414, 319 A.2d at 883.

Applying these legal principles to the facts of this case, we believe that requiring these appellants to spend the financial sums necessary to abate this condition, *based solely upon their ownership or occupancy of land*, would be to employee means unduly oppressive upon these individuals. We believe that such an exercise of police power would transcend 'the parameters of reason'. *We believe that EHB's conclusion that Section 316 is a declaration of the strict liability of these appellants to correct the condition is erroneous as a matter of law because such a construction of Section 316 would permit the Commonwealth to engage in regulation which constitutes the taking of property without compensation, and hence, would be an unconstitutional exercise of police power.* (emphasis supplied)

It is the duty of a court, when faced with a construction of a statute involving serious constitutional difficulties, to reject that interpretation in favor of another construction which will save its constitutionality. 2A J. Sutherland, Statutes and Statutory Construction § 45.11 (4th ed. C.

Sands 1973). 'Where a statute can be given two construc-
tions, one of which will render it constitutional and the
other unconstitutional, the former construction must be
invoked. *Dolan v. Linton's Lunch*, 397 Pa. 114, 152 A.2d
887 (1959); *Evans v. West Norriton Two, Municipal Au-
thority*, 370 Pa. 150, 87 A.2d 474 (1952); *Fidelity Philadel-
phia Trust Co. v. Hines*, 337 Pa. 48, 10 A.2d 553 (1940).'
*Pittsburgh Coal Co. v. Sanitary Water Board*, 4 Pa.
Cmwlth. 407, 424–25, 286 A.2d 459, 468 (1972), rev'd on
other grounds, 452 Pa. 77, 306 A.2d 308 (1973). See also
*Commonwealth v. MacDonald, supra* [464 Pa. 435] at 447,
347 A.2d [290] at 297.

We believe that there is a construction of Section 316
which both comports with the law of public nuisance and
renders that section constitutional as applied to the factu-
al situation present in this case. Where the polluting
condition is created by the conduct of an individual other
than the owner or occupier, the owner or occupier of the
land on which the condition exists cannot be liable to take
corrective measures under Section 316 on the basis of the
bare fact of ownership or occupancy. Such an owner or
occupier can be ordered to take corrective measures, how-
ever, if he permitted or authorized the creation on his
land. Such an owner or occupier can also be ordered to
take corrective measures if he (1) knows or should know of
the existence of the condition on the land; and (2) associ-
ates himself in some positive respect, beyond mere owner-
ship or occupancy, with the condition after its creation.
The key to imposing liability under Section 316 upon an
owner or occupier for the correction of a condition which
he did not create is that such an owner or occupier, after
knowing of the condition, engages in some affirmative
conduct indicating his adoption of the condition. Essen-
tially, this theory of liability for owners or occupiers who
do not create the condition is an application to Section 316
of the common law liability of owners or occupiers who
'continue' or 'adopt' a nuisance not created by them. See
66 C.J.S. *Nuisances* §§ 83–89 (1950); 58 Am.Jur.2d *Nui-
sances* §§ 48–56 (1971)."

It has always been recognized that the "right" of property ownership carries with it a concurrent "obligation" which is inherent in the basic relationship of an "owner" of property to society. These "obligations, however, have always related to the *use* one puts to property, not mere ownership. The ancient maxim of the common law is, "Sic utere tuo ut alienum non laedus", 9 Coke 59—So *use* your own property as not to injure your neighbor. Where society requires, the property of another can be *taken*, but only with due compensation. To construe the subject Act as providing for strict liability, based on nothing more than the ownership or occupation of land, would be to impose on innocent individuals the burden which should be borne by society as a whole, thus, an unconstitutional taking.

I, thus, concur only in the result.